Jasen, J.
This is an action for defamation. The plaintiff is a Justice of the Supreme Court, Second Judicial District. His complaint alleges that he was libeled in the book, "Cruel and Unusual Justice”, authored by defendant Jack Newfield and published by defendant Holt, Rinehart & Winston, Inc. After extensive pretrial discovery, defendants moved for summary judgment. Their motion was denied by Special Term. The Appellate Division, by a closely divided court, affirmed (53 AD2d 839), but granted defendants leave to appeal to our court upon a certified question.
The issue before us is whether plaintiff has established the existence of material facts sufficient to create a triable issue on his libel cause of action. More specifically, resolution of this appeal turns on whether plaintiff, a public official, has set forth facts sufficient to generate a triable issue on the constitutional elements of the libel complaint. (New York Times Co. *373 v Sullivan, 376 US 254.) We hold that defendants’ motions for summary judgment should have been granted and, therefore, the order of the Appellate Division should be reversed.
Jack Newfield is a controversial, well-known, investigative journalist. In 1972, Newfield focused his attentions on the criminal justice system in New York State, with particular emphasis on the administration of criminal justice in New York City. In the fall of 1972, he authored five articles on judicial conduct which appeared in the Village Voice, a weekly newspaper. An additional article, "The Ten Worst Judges in New York”, was published in New York Magazine. The thrust of these articles was that Judges in the New York City courts were selected for political reasons and not on the merits of their qualifications for judicial office. Several Judges, identified by name, were described as incompetent or corrupt, and several decisions rendered by these Judges were cited by the author to illustrate his criticisms. The author contended that these Judges were lenient on defendants with political influence and with defendants charged with distribution of significant amounts of narcotics. By contrast, it was asserted, these same Judges were too harsh on defendants from disadvantaged backgrounds, especially on common narcotics addicts charged with comparatively minor offenses. Newfield advocated the removal of these Judges from the Bench and called for over-all reform of the method of selecting Judges. Listed as among the 10 worst Judges in New York was plaintiff. The Newfield articles were highly critical of plaintiff’s judicial performance.
Prior to the publication of the Newfield series, a separate news article appeared in the New York Daily News reporting that Justice Rinaldi was one of four Judges accused by the Joint Legislative Committee on Crime of handing down "wrist-slap” sentences in felony narcotics cases. During the time that the Newfield articles were appearing, the New York Times published a news story that plaintiff had sentenced an organized crime figure, charged with bribery of a police officer, to a fine of $250, while, on that same day, he imposed a sentence of imprisonment, with a maximum of five years, on a 19-year-old youth alleged to have robbed a drugstore.
In May, 1973, plaintiff brought an action against the Village Voice and its advertising agency for libel and invasion of privacy committed in an advertisement for the Voice which appeared in the New York Times. The advertisement con *374 tained a caricature of the plaintiff and the text referred to the first of the original articles in the Newfield series. Defendants’ motion for summary judgment was denied and the action was subsequently settled before trial. (See Rinaldi v Village Voice, 47 AD2d 180, cert den 423 US 883.) The complaint was predicated on the assertion that, after publication of the original articles, the Voice received information which refuted Newfield’s allegations of misconduct.
Plaintiff was indicted, on November 13, 1973, by the Extraordinary Special Grand Jury of Kings County on two counts of perjury committed before the Grand Jury. The Grand Jury had been investigating Justice Rinaldi’s disposition of two cases unrelated to those reported earlier by New-field. Upon indictment, plaintiff was suspended from performance of judicial duties. He was acquitted of these charges in August, 1974, and was re-elected to the Supreme Court, without opposition, in November, 1974.
During the pendency of the criminal charges against plaintiff, Holt, Rinehart & Winston, Inc., a publishing house, published a book by Jack Newfield entitled "Cruel and Unusual Justice”. The book consisted largely of reprints of Newfield’s original Voice and New York Magazine article. The articles were edited slightly for style and form during the course of preparation of the book and were updated through the addition of postcripts. The book is divided into two parts. The first part, "Prisons”, related to a description of alleged abuses committed in various penitentiaries located in New York State. The latter portion of the book, "Courts”, contains the reprints of Newfield’s original series on judicial performance and selection in New York City.
Plaintiff commenced this action for libel against Newfield, Holt, Rinehart & Winston, and the Village Voice. Special Term granted summary judgment to the Voice on the ground that the Voice had merely acquiesced in the republication of the alleged libel. However, motions by the other two defendants for summary judgment were denied. On cross appeals, the Appellate Division affirmed. The only issue presented to our court is whether the separate motions for summary judgment of defendants Newfield and Holt, Rinehart & Winston were properly denied.
Plaintiff alleged, in his complaint, that defendants maliciously published false, scandalous and defamatory matter by which defendants meant "that the plaintiff was and is a *375 corrupt, venal, biased, incompetent and unqualified justice of the Supreme Court of the State of New York who should be removed from office.” The particular statements in each chapter contended to be objectionable may be briefly excerpted and summarized. Importantly, the passages of the book to which we refer are only those specifically put at issue by the plaintiffs complaint. Equally important, the passages that are at issue contain serious charges that have never been substantiated in a court of law. The ultimate truth of the Newfield charges has never been determined. Of the greatest significance, and an important caveat, our references to, and discussion of, the Newfield charges at the root of this case, in no way reflect any view as to the accuracy, or even the legitimacy, of the extremely grave accusations that have been made by Newfield against the plaintiff.
In a chapter entitled, "The Ten Worst Judges in New York”, Newfield wrote that plaintiff "is very tough on long-haired attorneys and black defendants, especially on questions of bail, probation, and sentencing. But his judicial temper softens remarkably before heroin dealers and organized crime figures.” Newfield set forth three illustrative cases. In August, 1972, a narcotics distributor, named Norman Burton, with a history of 12 prior arrests, had been held on a charge of heroin possession and on a charge of attempted bribery of a police officer. Plaintiff released Burton without bail. In October, 1970, another narcotics dealer, Clifton Glover, had been permitted to plead guilty and was then given a conditional discharge. Glover could have received a maximum sentence of 25 years’ imprisonment. Glover had been charged with a class C felony for which the statute specifically prohibited the imposition of conditional discharges. The third case, People v Vario, arose in Suffolk County, where plaintiff was assigned for the summer of 1967. Plaintiff "caused a local scandal” by permitting three prominent organized crime figures, charged with bribery and conspiracy, to plead guilty to misdemeanors and assessing only $250 fines. The prosecutor had recommended that the three each serve at least one year in prison.
In a second chapter, "Justice Gets a Fix”, Newfield again reported plaintiff’s dispositions in People v Burton and People v Glover. With reference to his release of Burton without bail, it was stated, "[t]his was not the first time Judge Rinaldi has let a heroin dealer go free. He has a reputation among lawyers and court reformers for going soft on pushers, espe *376 cially when they are represented by certain well-connected bail bondsmen and lawyers”. Newfield wrote that "what Judge Rinaldi is doing is no small thing. He is putting people on the street who sell death for a profit.” It was reported that, in the Burton case, plaintiff "abused” the officer who had reported the bribery attempt-
Newfield stated that he had spent several weeks carefully analyzing records of plaintiff’s previous dispositions. Newfield detected a "disturbing pattern”. "Blacks and Puerto Ricans got high bail and long sentences. Defendants connected with organized crime families were treated permissively—motions granted, misdemeanor pleas accepted, suspended sentences given, fines imposed instead of jail terms. Occasionally large-scale heroin dealers would get inexplicably lenient sentences, even conditional discharges, for Class A felonies. And certain Brooklyn lawyers would almost always win their cases against Rinaldi. My instincts smelled a rat. I decided to begin a personal crusade to alert the judicial, legal, and political establishments to this incompetent and probably corrupt member of the judiciary.”
Although these two chapters contained the bulk of the criticism of plaintiff, plaintiff was also mentioned in several other portions of the book. Newfield advocated the removal of plaintiff from judicial office, asserting that there was a "sufficient pattern of incompetent decisions” made by plaintiff "to justify the rare spectacle of a judicial trial.” Further, Newfield contended that plaintiff has "influential friends outside the court system”, as evidenced by his assignment to Suffolk County part of the year, despite the objections of the local District Attorney. Plaintiff allegedly was "cruel and abusive to defendants”. Finally, it was reported that "[ejvery law enforcement agency in the state is aware” of plaintiff’s "reputation for going easy” on members of organized crime. Assertedly, "the Joint Legislative Committee on Crime has a whole file full of suspicious dispositions” by plaintiff in cases involving organized crime.
In his complaint, the plaintiff alleged that, as a result of the book, his good name and reputation have been damaged and he has been held up to public scorn, ridicule and contempt. He sought $5,000,000 in damages. No special damages were alleged. Plaintiff’s contention is that Newfield failed to accurately report the facts of the cases relied upon to illustrate his conclusion that plaintiff was "incompetent”, "probably cor- *377 rapt”, and "suspiciously lenient”. He points to the fact that, in People v Burton, the defendant was before him solely on the bribery charge and not for any drug offense. Another Judge had previously released Burton without bail on the drug charges and plaintiff, with the consent of the District Attorney, followed the prior disposition. However, the transcript of the proceedings indicates that plaintiff had originally decided to put the defendant in jail and did not change his decision until after he had an angry altercation with the arresting officer. In reference to People v Glover, plaintiff admits he imposed an illegal sentence, but contends that this was done, again with the prosecutor’s consent, so that defendant might immediately commence service of a Federal sentence (which was based upon a judgment on which the time to appeal had expired). Thus, Glover was not freed and permitted to walk the streets, as alleged by Newfield. Plaintiff also contends that he permitted the misdemeanor pleas in People v Vario because the prosecutor recommended it in light of an appellate decision which directed the suppression of wiretap evidence crucial to the felony count. Yet, the transcript does reflect that plaintiff assessed only fines, whereas the prosecutor had sought one-year terms of imprisonment. *
There is a fourth case in dispute as well, People v Agro, mentioned in the New York Times account. In this case, defendants were charged with having conspired to swindle large sums of money from Macy’s department store. Upon the recommendation of a prosecutor, all defendants were permitted, by plaintiff, to plead to petit larceny. Plaintiff subsequently gave Salvatore Agro a suspended sentence. The official transcript reflects that only the attorney for the defendant, and no prosecutor, appeared at the sentencing proceeding.
Plaintiff also relies upon two reports which found Newfield’s accusations to be without merit. The first report is by the Brooklyn Bar Association and is dated November 13, 1972. *378 This report was issued after the publication of the original article but prior to the publication of the book. In the book, Newfield refers to the report and quotes from it. Newfield countered the report by writing that the author of the report was a "Court Street” lawyer "with ties to the Brooklyn clubhouses” and had interviewed only the plaintiff in preparing the report. The second report, dated June 8, 1973, is by the Committee on State Courts of Superior Jurisdiction of the Association of the Bar of the City of New York. Although the report is dated prior to the publication of the book, the copy in this record is marked "confidential” and the report was not actually released until 10 months later, after "Cruel and Unusual Justice” had been printed and shipped to retail outlets for sale. However, both reports concluded that Newfield’s accusations against plaintiff were unfounded.
There is only one further fact to be noted. In the course of an examination before trial, Newfield stated that the sources for some of his disparaging comments about Justice Rinaldi were attorneys, some from the Legal Aid Society, who regularly practice in the Brooklyn courts. While he disclosed the identity of a few of his sources of information, Newfield, for the most part, invoked the benefits of a statute shielding newsmen from contempt for failure to reveal a news source. (Civil Rights Law, § 79-h.) His authority to do so has not been challenged but the defendants have been precluded from calling as witnesses at the trial any source who Newfield refused to identify.
It is true, as noted by the dissent (p 388), that Newfield in the course of an examination before trial in the earlier action against the Voice, made a self-serving statement that he had not intended to allege corruption or venality. It is also true, and more to the point, that, in Newfield’s answer in this action, it was admitted that the articles complained of "speak for themselves”. Newfield’s affidavit, submitted on the summary judgment motion in this action, specifically states that it is his contention "that the allegedly defamatory material originally published in the Voice (and later republished in [the book]) was true at the time of publication.” Indeed, he later asserted that "at the time I completed work on [the book], I had no reason to doubt the accuracy of the material contained therein and to this very day continue to believe in the accuracy of all the factual material contained in the book, as well as the reasonableness of the many opinions I drew therefrom.” *379 It is concluded, then, from a realistic appraisal of the record that, aside from three minor inaccuracies upon which plaintiff places no reliance, the truth of the statements made by Newfield, including the ultimate accusation of corruption, is in open dispute.
To begin with, we have no doubt that the complaint states a good cause of action for libel per se and that there was no need for plaintiff to allege special damage. "Any written or printed article is libelous or actionable without alleging special damages if it tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of,their friendly intercourse in society.” (Sydney v Macfadden Newspaper Pub. Corp., 242 NY 208, 211-212; Gates v New York Recorder Co., 155 NY 228, 231, 232.) Certainly, to falsely state that a Judge is incompetent and corrupt, especially where, as here, there are strong undertones of illegality, is to hold him up to disgrace and contempt. Thus, unlike James v Gannett Co. (40 NY2d 415, mot for rearg den 40 NY2d 990), there is no question but that at common law, as it stood prior to New York Times Co. v Sullivan (376 US 254, supra), the statements complained of are defamatory. But the matter does not end there.
The plaintiff is a public official and this libel action is, therefore, governed by the constitutional principles first enunciated in New York Times Co. v Sullivan (376 US 254, supra). In the Times case, the Supreme Court took note of the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.” (376 US, at p 270.) The court ruled that the First Amendment prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless the official proves that the statement was made with actual malice—i.e., with knowledge that the statement was false or with reckless disregard of whether it was false or not. (376 US, at pp 279-280.) The constitutional standard requires that the plaintiff establish the existence of actual malice by proof of "convincing clarity”. (376 US, at pp 285-286.)
More recent decisions make clear the great extent to which New York Times and its progeny have altered traditional rules governing libel actions. At common law, the libelous *380 statement was presumed to be false and the defendant carried the burden of pleading and proving, in defense, that the statement was true. (See, e.g., Prosser, Torts [4th ed], § 116, p 798; Seelman, Law of Libel and Slander in New York, pars 170, 392.) Although there has been doubt (see Restatement, Torts 2d, § 582 and comment thereon), the burden is now on the libel plaintiff to establish the falsity of the libel. (Cox Broadcasting Corp. v Cohn, 420 US 469, 490.) This requirement follows naturally from the actual malice standard. Before knowing falsity or reckless disregard for truth can be established, the plaintiff must establish that the statement was, in fact, false.
The nature of the statement is critical. The First Amendment does not recognize the existence of false ideas. "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.” (Gertz v Robert Welch, Inc., 418 US 323, 339-340.) Opinions, false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions, provided that the facts supporting the opinions are set forth. (Buckley v Littell, 539 F2d 882, 893, cert den 429 US 1062; Restatement, Torts 2d, § 566.) Especially in a State in which Judges are elected to office, comments and opinions on judicial performance are a matter of public interest and concern. The rule of the Times case was designed to protect the free flow of information to the people concerning the performance of their public officials. (Garrison v Louisiana, 379 US 64, 77.) The public, clearly, has a vital interest in the performance and integrity of its judiciary.
The expression of opinion, even in the form of pejorative rhetoric, relating to fitness for judicial office or to performance while in judicial office, is safeguarded. (Cf. Letter Carriers v Austin, 418 US 264, 283-284.) Erroneous opinions are inevitably put forward in free debate but even the erroneous opinion must be protected so that debate on public issues may remain robust and unfettered and concerned individuals may have the necessary freedom to speak their conscience. (See New York Times Co. v Sullivan, 376 US 254, 271-272, supra.) Plaintiff may not recover from defendants for simply expressing their opinion of his judicial performance, no matter how *381 unreasonable, extreme or erroneous these opinions might be. (See Hotchner v Castillo-Puche, 551 F2d 910, 913.)
"Judges are supposed to be men of fortitude, able to thrive in a hardy climate.” (Craig v Harney, 331 US 367, 376.) Judicial office is not a place for those who are oversensitive to comments made in the public press. As Mr. Justice Powell stated in Gertz v Robert Welch, Inc. (418 US 323, 344, supra): "An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case.” Judicial office demands an even higher price. Judges are constrained, by principles of judicial ethics, to refrain from engaging in unseemly public debate. (Cf. Code of Judicial Conduct, Canon 3, subd [A], par [6].) Obedience to the rule of silence can be painful when matters of personal integrity are at stake.
Whether a particular statement constitutes fact or opinion is a question of law. (Letter Carriers v Austin, 418 US 264, supra; Gregory v McDonnell Douglas Corp., 17 Cal 3d 596, 601.) To state that a Judge is incompetent is to express an opinion regarding the Judge’s performance in office. Likewise, to advocate a Judge’s removal from office is to express the opinion that the Judge is unfit for his office. Both opinions, even if falsely and insincerely held, are constitutionally protected, if the facts supporting the opinion are set forth. Here, Newfield set forth the basis for his belief that plaintiff is incompetent and should be removed. Based upon the facts stated and public debate provoked by the statements, each reader may draw his own conclusion as to whether Newfield’s views should be supported or challenged. In short, the matter is subject to public debate. Plaintiff may not delimit that debate by seeking to punish, through libel damages, those who would contribute to the debate through the circulation of strong, even harsh, contrasting opinions. By our holding, we do not necessarily imply our acceptance of Newfield’s views; we say only that he has the right to express and circulate his opinion, whether he is right or not.
Newfield’s assertions that plaintiff is "probably corrupt” and that his sentences of certain defendants were suspiciously lenient, with their strong undertones of conspiracy and illegality, rest on a different footing than his opinions as to plaintiff’s judicial performance. These words were not used merely in a "loose, figurative sense” to demonstrate Newfield’s strong *382 disagreement with some of plaintiffs dispositions. (See Letter Carriers v Austin, 418 US 264, 284, supra.) The ordinary and average reader would likely understand the use of these words, in the context of the entire article, as meaning that plaintiff had committed illegal and unethical actions. Accusations of criminal activity, even in the form of opinion, are not constitutionally protected. (Gregory v McDonnell Douglas Corp., 17 Cal 3d 596, 604, supra; cf. Palm Beach Newspapers v Early, 334 So 2d 50, 52 [Fla]; St. Amant v Thompson, 390 US 727, 730; but see Garrison v Louisiana, 379 US 64, 76-77, supra.) While inquiry into motivation is within the scope of absolute privilege, outright charges of illegal conduct, if false, are protected solely by the actual malice test. As noted by the Supreme Court of California, there is a critical distinction between opinions which attribute improper motives to a public officer and accusations, in whatever form, that an individual has committed a crime or is personally dishonest. No First Amendment protection enfolds false charges of criminal behavior. (Gregory v McDonnell Douglas Corp., supra; cf. James v Gannett Co., 40 NY2d 415, supra.)
Here, plaintiff has not set forth sufficient evidentiary facts to generate a triable issue of fact as to the falsity and actual maliciousness of the accusations of criminal conduct. It is the plaintiffs burden to establish that he is not "probably corrupt” and that no sentences were unduly lenient. Although plaintiff was acquitted of criminal charges, the acquittal came after publication and involved dispositions other than the ones at issue in this case. While plaintiff has established that Newfield omitted certain facts from his statement of the cases, Newfield’s over-all accusations have not been rebutted by anything more than a general denial of wrongdoing. Hence, there are no evidentiary facts which would support plaintiff’s claim that Newfield’s accusations are false. Further, there is no triable issue as to actual malice. Newfield did undertake a certain amount of investigation and there is no proof that he published his allegation of probable corruption knowing that allegation to be false or in reckless disregard of its truth. Even if his accusations are false, as they may well be, the Constitution, as interpreted by the United States Supreme Court, bars recovery.
As to Holt, Rinehart & Winston, the case is even stronger. The publisher placed its reliance upon Newfield’s reportorial abilities and there is no showing that Holt, Rinehart & *383 Winston had, or should have had, substantial reasons to question the accuracy of the articles or the bona fides of its reporter. (E.g., James v Gannett Co., 40 NY2d 415, 424, supra; St. Amant v Thompson, 390 US 727, 733, supra; Trails West v Wolff, 32 NY2d 207, 219.) Indeed, the New York Times article and plaintiffs subsequent indictment lent credence to Newfield’s account. Similarly, the publisher could elect to credit its author’s version of the facts as well as his reasons for discrediting the Brooklyn Bar Association report. That the articles drew criticism when originally published did not preclude a responsible publishing house from reprinting them. (See, also, Edwards v National Audubon Soc., 556 F2d 113.)
It is true, of course, that false statements of fact can be actionable. However, the omissions in this case are not so material as to alter significantly the conclusion to be drawn from the episodes reported. (Cf. Hotchner v Castillo-Puche, 551 F2d 910, 913-914, supra.) Although a sentencing court may place a certain amount of reliance upon representations of the attorneys appearing before it, including, of course, prosecutors, the court, and not the prosecutors, has the ultimate responsibility for the sentences imposed. Furthermore, the book was clearly not designed to be an objective account of plaintiffs judicial dispositions. The book took definite editorial positions on significant issues and advocated reforms and corrective action. Plaintiff was not the central focus of the book. It was a book written from a subjective, rather obvious, point of view and did not purport to be anything else. Although he could not make up facts out of whole cloth (cf. Spahn v Julian Messner, Inc., 21 NY2d 124, app dsmd 393 US 1046), omission of relatively minor details in an otherwise basically accurate account is not actionable. This is largely a matter of editorial judgment in which the courts, and juries, have no proper function. (James v Gannett Co., 40 NY2d 415, 424, supra.) To paraphrase Chief Justice Burger’s statements in Miami Herald Pub. Co. v Tornillo (418 US 241, 258), the choice of material to go into a book and the decisions made as to limitations on size and content, and treatment of public issues and public officials, whether fair or unfair, constitute the exercise of editorial judgment. "It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.” Moreover, *384 the factual omissions are not at the root of this action. The gravamen of the complaint is directed at the opinions advocated by Newfield and, for the reasons previously set forth, those opinions are not actionable.
The award of summary judgment in libel actions, as in civil actions generally, is appropriate where there are no material triable issues of fact. (E.g., CPLR 3212; James v Gannett Co., 40 NY2d 415, supra; Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, 200; Trails West v Wolff, 32 NY2d 207, 221, supra; Gilberg v Goffi, 21 AD2d 517, 527, affd 15 NY2d 1023; Bandelin v Pietsch, 563 P2d 395 [Idaho, 1977].) After a thorough review of the extensive record compiled in this case, we are of the view that plaintiff has failed to establish the existence of triable issues, which, if resolved in his favor, would warrant a finding of libel liability. The defendants’ motions for summary judgment should have been granted.
With reference to the dissent, it should be noted that the rule of the Times case is not to be applied woodenly or mechanically. The principles established in New York Times Co. v Sullivan and developed in subsequent cases, represent significant protections for the lifeblood of a free, fair, responsive and responsible press. To be independent of political influence, to inform the reading public on matters of concern and interest, and to perform its important, yet informal, task, especially valued in this decade, of light-shedding on the activities of government officials, the press must be safeguarded from crippling libel suits, brought to punish those who exercise free speech and to deter others, by chilling the atmosphere, from expressing disagreement in public forums. To be sure, the standards enunciated in the Times case are strict. But laxity is not permitted here, because under Federal constitutional principles, loose rules and only casual judicial review with a bias toward the tort plaintiff would hamper the operations of the free press. Judge J. Edward Lumbard has stated the guiding principles well. "These strict tests may sometimes yield harsh results. Individuals who are defamed may be left without compensation. But excessive self-censorship by publishing houses would be a more dangerous evil. Protection and encouragement of writing and publishing, however controversial, is of prime importance to the enjoyment of first amendment freedoms. Any risk that full and vigorous exposition and expression of opinion on matters of public interest may be stifled must be given great weight. In *385 areas of doubt and conflicting considerations, it is thought better to err on the side of free speech.” (Hotchner v Castillo-Puche, 551 F2d 910, 913, supra.)
In response to Judge Fuchsberg’s concurring opinion, only two comments are necessary. It is totally unwarranted to suggest that, somehow, judicial immunity from libel suit bears on, or relates to, the imposition of a constitutional burden of proof on a Judge who brings a libel action. Quite apart from whether the statements of Judges should be privileged, which is a matter of State law, Judges are public officers to whom the Federal constitutional decision in New York Times Co. v Sullivan is applicable. This is the point of the majority opinion. To the extent that it misses the point, the concurring opinion reflects a misunderstanding of the constitutional law of libel.
Secondly, the comments made in the same concurring opinion with respect to the desirability of increasing the effectiveness of the legal profession in rising to the defense of allegedly falsely maligned Judges are expressly disapproved. Whether the organized legal community should develop rules to govern the question of protecting Judges from assertedly unfair criticism is a matter for the legal community itself to resolve. It would be tasteless and inapt for our court as an institution, or for any one of us, to express any view on this matter at this time, much less approvingly cite proposed rules only recently put forward for discussion purposes. Finally, we have no doubt that the profession will, as it has always done, rise to the defense of reputable Judges falsely accused in the public press. Indeed, in this case, two different bar associations studied the matter and publicly supported the plaintiff. The honorable will be doubtless defended; only those whose conscience is stained need fear.
To conclude, the Supreme Court has required that a libel plaintiff who is a public official must carry a constitutional burden of proof with convincing clarity. On this record, we cannot say that there are triable issues of fact, which if resolved in plaintiff’s favor, would permit a jury to conclude that the constitutional burden of proof by convincing clarity has been satisfied.
Accordingly, the order of the Appellate Division should be reversed and defendants’ motions for summary judgment granted. The question certified by the Appellate Division is answered in the negative.

 There are three relatively minor inaccuracies which are conceded by Newfield and upon which plaintiff does not place any degree of reliance. Newfield had reported that all three defendants in the Vario case had received $250 fines. However, only the principal defendant, Paul Vario, received such a fine. The other two defendants were fined $500. In People v Glover, the maximum sentence which defendent could have received was 15 years’ imprisonment, not the 25-year term reported by Newfield. Finally, as discussed in text, Norman Burton had been arraigned solely on the bribery charge, not upon both bribery and drug selling charges as Newfield had written. However, plaintiff was, admittedly, aware of the narcotics charges that gave rise to the bribery allegation.