Ernest R. ZERMAN, Plaintiff,

v.

**SULLIVAN & CROMWELL, a partnership, John F.X. Peloso, Sage Gray Todd & Sims, a partnership, and Dow Jones & Company, Inc., Defendants.**

No. 84 Civ. 5938 (CSH).

United States District Court,
S.D. New York.

Jan. 15, 1988.

Ernest R. Zerman, pro se.

Sullivan & Cromwell, pro se; Marvin Schwartz, Jeh C. Johnson, Michael Straus, New York City, of counsel.

Sage Gray Todd & Sims, pro se and for John F.X. Peloso; John F.X. Peloso, Stuart Krause, New York City, of counsel.

Patterson, Belknap, Webb & Tyler, for defendant Dow Jones & Co., Inc.; Gregory L. Diskant, Katherine Raymond, New York City, of counsel.

### MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff *pro se,* an attorney admitted to the practice of law in New Jersey currently residing in Florida, initiated this action on August 14, 1984. The complaint alleges three counts, all pertaining to the publication of an article in the Wall Street Journal, a popular and influential daily financial newspaper owned by defendant Dow Jones & Company, Inc.[1] All defendants now move to dismiss the complaint pursuant to F.R.Civ.P. 12, for summary judgment pursuant to F.R.Civ.P. 56, and for sanctions pursuant to F.R.Civ.P. 11. Plaintiff cross-moves for summary judgment pursuant to F.R.Civ.P. 56. Plaintiff also moves for leave to file a supplemental complaint.

For the reasons that follow, the defendants' motions to dismiss or for summary judgment are granted, defendant Dow Jones' motion for sanctions is denied, all other defendants' motions for santions are granted, and the plaintiff's motions are denied.

*Background*

On August 15, 1983, the Wall Street Journal ("the Journal") published an article headlined: COUPLE'S SUITS AGAINST FIVE BROKERS RAISE TEMPERS IN NEW YORK, FLORIDA COURTROOMS. The article, which appeared on the first page of the Journal's second section, purported to describe five lawsuits initiated by plaintiff and/or his wife against securities brokerage firms.[2] It contained statements attributed to defendant John F.X. Peloso ("Peloso"), an attorney who represented two of the brokerage firms involved in litigation with the Zermans[3], and statements attributed to Bradley Prozeller ("Prozeller"), an attorney involved in the representation of another brokerage firm in litigation with the Zermans.[4]

The 39 paragraph complaint, with several attachments, asserts three "counts", all of which are apparently asserted against all defendants. In the first count, Zerman asserts that the article contained statements that amount to "libel *per se* ", based on his contention that they "meant that plaintiff started suit to shake down or extort money from the 5 brokerage houses...." Complaint ¶ 17. In the second count, Zerman identifies specific alleged misstatements of fact which he contends are actionable as "defamatory libel". Complaint ¶ 35. In the third count, captioned "Invasion of Privacy", Zerman contends that he "warned defendant[5] not to publish said article and defendant acted willfully and maliciously by publishing said article, all to plaintiff's general damage, in violation of 5th and 4th Amendment [sic] to U.S. Constitution, amounting to $400,000." Complaint ¶ 39. Each of these counts is discussed in turn below.

The article, Appendix A to this Memorandum Opinion and Order, contains 30 paragraphs of text, and a highlighted statement (which could perhaps be termed a secondary headline) boxed in the middle of the text which reads: ERNEST AND EVE-

---

1. Subject matter jurisdiction in this Court is based on diversity of citizenship.

2. Some of the suits initiated by plaintiff or his wife have been the subject of published decisions. *See e.g. Zerman v. Melton,* 735 F.2d 751, (2d Cir.1984), *Zerman v. Ball,* 735 F.2d 15 (2d Cir.1984).

3. Defendant Sage, Gray, Todd & Sims is the law firm of which Mr. Peloso was a member at the time of the representation mentioned in the text.

4. Mr. Prozeller is not sued in this action, but his former law firm, Sullivan & Cromwell, is named as a defendant.

5. The third count may be directed solely against the publisher of the article, defendant Dow Jones Company, Inc., but is not explicitly so limited.

LYN ZERMAN CLAIM THAT THE BRO-KERS USED THEIR ACCOUNTS TO GENERATE EXCESSIVE COMMIS-SIONS, BUT JUDGES SUSPECT THE COUPLE OF PLAYING THE COURTS IN-STEAD OF THE MARKET. The text of the article repeats, in substance, the high-lighted phrase.

The article reports that the Zermans sued five brokerage firms "claiming that the brokers used their accounts to generate excessive commissions and that they made unsuitably risky investments." The article further reports that of these suits, "three have been dismissed, one has been settled and one is pending." From this track record, the article suggests that "[j]udges suspect the Zermans ... of playing the courts instead of the market".[6]

*Discussion*

 The Court's responsibility in con-sidering a motion for summary judgment under Rule 56 is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reason-able inferences against the moving party". *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (cita-tions omitted). The mere existence of fac-tual disputes will not suffice to defeat a motion for summary judgment unless the disputed issues are material to the claims or defenses asserted in the action. *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam). Materi-ality is determined according to the applica-ble substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party against whom summary judgment is sought may not rest upon allegations, spec-ulation, or conjecture to defeat the motion, but must instead provide "concrete particu-lars showing that a trial is needed." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)).

*Choice of Law*

 Under New York choice of law rules, which apply to this diversity action, *see Sweeney v. Schenectady Union Pub-lishing Co.*, 122 F.2d 288 (2d Cir.1941) *aff'd* 316 U.S. 642, 62 S.Ct. 1031, 86 L.Ed. 1727 (1942), the state with the most significant relationship to the tort alleged in the com-plaint supplies the governing substantive law. *Nader v. General Motors Corp.*, 25 N.Y.2d 560, 307 N.Y.S.2d 647, 255 N.E.2d 765 (1970); *see also Davis v. Costa–Gav-ras*, 580 F.Supp. 1082, 1091 (S.D.N.Y.1984). When the tort alleged is libel, the state of plaintiff's domicile at the time of the al-leged libel is usually the state with the most significant relationship to the action, since that is where he is presumed to have been most injured. *Davis, supra,* citing Restatement (Second) of Conflict of Laws § 150(2) (1977). However, as Judge Sofaer explained in *Davis:*

> This presumptive choice of law does not hold true, however, if 'with respect to the particular issue, some other state has a more significant relationship to the issue or the parties'. (citations omitted)

*Id.,* 580 F.Supp. at 1091.

In this district, nine factors are con-sidered particularly relevant to choice of law in libel cases involving more than one state. *See Palmisano v. News Syndicate Co., Inc.*, 130 F.Supp. 17, 19 n. 2 (S.D.N.Y. 1955); *Davis, supra.* These factors are:

(1) the state of the plaintiff's domicile;

(2) the state of plaintiff's principle activi-ty to which the alleged defamation relates;

(3) the state where the plaintiff in fact suffered greatest harm;

(4) the state of the publisher's domicile or incorporation;

(5) the state where the defendant's main publishing office is located;

(6) the state of principal circulation;

(7) the state of emanation;

(8) the state where the libel was first seen; and

(9) the law of the forum.

---

**6.** Additional specific factual assertions and oth-er statements contained in the article, are dis-cussed below in connection with particular claims.

Of these factors, only one clearly points away from application of New York law to the substantive allegations in the complaint, and that is the state of plaintiff's domicile. All other factors either clearly or arguably point to the application of New York law to the instant action.

The factors I consider "arguable", and which therefore require some discussion, are (2) and (3) above. Defendants argue that the state of "plaintiff's principal activity to which the alleged defamation relates" is clearly New York, as most of the five suits discussed in the article were brought in New York. The alleged defamation, however, relates to more than plaintiff's litigation activity; it also relates to plaintiff's motives for establishing brokerage accounts in Florida. On the other hand, all specific factual errors relied upon by plaintiff in the complaint's second count relate to New York litigation. *See infra.* On balance, I agree with defendants that this factor points toward the application of New York law, although it would be incorrect to say that Florida has no "contact" at all with this factor.

The state where plaintiff "in fact suffered" greatest harm is a difficult factor to weigh. Defendants contend that plaintiff suffered no harm at all by virtue of the article's publication. In addition, they point out that of the specifically alleged injuries contained in the complaint, most relate to the effect the article allegedly had on his pending lawsuits. Complaint ¶ 2. Most of these cases were pending in New York. In addition to the alleged effect on pending litigation, plaintiff claims that the article damaged his "business life", Complaint ¶ 28, without explaining which "business" is affected. Even assuming that this alleged damage to his "business life" is more related to Florida than New York, I cannot say that this factor clearly favors the application of Florida law to the instant action. At best (from plaintiff's perspective), I consider this factor to be evenly weighed between New York and Florida.

Considering all nine factors, I conclude that New York is the state with the most significant contacts to the alleged libel. I therefore apply New York law in resolution of the present motions.

I now turn to consideration of each count alleged in the complaint.

*Count I*

■ The first count in the complaint, directed toward all defendants "jointly, severally and individually", ¶ 17, alleges that certain statements in the article constitute "libel *per se*" because they "impute[ ] the commissions [sic] of several crimes to plaintiff". ¶ 15.

Two crimes are allegedly imputed to Zerman. First, the article allegedly accuses him of the crime of extortion with the following phrases: "They say the couple aims to *set up* brokerage houses as securities fraud defendants ..." (emphasis added) and "Mr. Peloso, the attorney, says the cases are all 'essentially indistinguishable,' and that's why he brought the latest case in Florida. 'He undoubtedly hopes his name won't be recognized there, because he realizes his *game is up* in the Southern District of New York ...." (emphasis added). Second, the article allegedly accuses Zerman of the crime of wrongful conversion in the following passage: "But Zerman didn't repay Bache. Instead he sued the firm for liquidating his account due to lack of collateral ... Bache's attorney, Bradley Prozeller, says Bache hasn't gotten its money yet."

"Accusations of criminal activity, even in the form of opinion, are not constitutionally protected." *Rinaldi v. Holt, Rinehart of Winston, Inc.*, 42 N.Y.2d 369, 382, 397 N.Y.S.2d 943 at 951, 366 N.E.2d 1299, 1307, *cert. denied* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977). To be unprotected, however, the statement, read in context by "the ordinary and average reader ... [must be understood] as meaning that plaintiff had committed illegal and unethical actions." *Id.* 42 N.Y.2d at 382–83, 397 N.Y.S.2d at 951, 366 N.E.2d at 1307. *Accord Mr. Chow v. Ste. Jour Azur S.A.*, 759 F.2d 219, 225 (2d Cir.1985).

When read in context, the statements relied upon by plaintiff in count one do not accuse plaintiff of illegal conduct. The first phrase relied upon by plaintiff appears in the following context:

After all the activity, judges and brokers involved with the Zermans wonder

why the Zermans keep investing when they keep losing money, and why they continue to appeal when their cases are repeatedly dismissed.

"The reason we continue investing is that we're dissatisfied with the brokers' performance and we want to recoup our losses," Mr. Zerman says.

But lawyers for the five securities firms speculate that the Zermans have a different motive. They say the couple aims to set up brokerage houses as securities fraud defendants to avenge a bookkeeping error that originally put the Zermans at loggerheads with Bache.

When considered in context, it is clear that the "lawyers" statement regarding the Zermans' aim to "set up" brokerage houses is nothing more than speculation about their motivations. As a clear statement of opinion, it cannot be said to be a direct accusation of criminal activity, and thus does not support a claim for libel.

The second and third statements relied upon by plaintiff in his first count appear in this context:

The error occurred in March 1980, when Mr. Zerman deposited six U.S. Treasury Bonds with Bache's Hallandale office. Five of the bonds had a face value of $1,000 each, and one had a face value of $5,000. But Bache says its computerized accounting statement mistakenly characterized the five $1,000 bonds at $10,000 each, crediting Mr. Zerman with $55,000 instead of $10,000.

When Mr. Zerman received the statement, he didn't correct the error. Instead, he waited a month and then directed Bache to sell the bonds. He was sent a check for $57,730.01, reflecting the sale cost and interest. When Bache discovered the error, it demanded $47,234.57 from Mr. Zerman, the amount of the incorrect check minus the proceeds of his actual $10,000 investment.

Liquidating an Account

But Mr. Zerman didn't repay Bache. Instead, he sued the firm for liquidating his account due to lack of collateral. Mr. Zerman said he knew an error had been made but alleged, among other charges,

that it was purposely designed to mislead him into believing that his account met margin requirements. The case was tossed out, and the judge ordered Mr. Zerman to obey the customer's agreement he signed with Bache in 1977, requiring settlement of disputes by arbitration.

Rather than arbitrate, Mr. Zerman filed an appeal with the Second Circuit Court. That court affirmed the federal court's decision and ordered Mr. Zerman to repay Bache.

But he still wouldn't repay Bache. Instead, he field a petition for rehearing, but it was denied. Mr. Zerman was then ordered to cease filing motions until he arbitrated with Bache.

Bache's attorney, Bradley Prozeller, says Bache hasn't gotten its money yet. "Mr. Zerman has persisted in his lawsuit through a series of frivolous motions and petitions," he says. The fact that he accepted money not belonging to him "and tried to ma½e off with the proceeds shows the frivolousness of his suit," he says.

Mr. Peloso, the attorney, says the cases are "all essentially indistinguishable," and that's why Mr. Zerman brought the latest case in Florida. "He undoubtedly hopes his name won't be recognized there, because he realizes his game is up in the Southern District of New York," Mr. Peloso says.

Considered in context, Mr. Peloso's statement that Zerman's "game is up in the Southern District of New York" cannot reasonably be understood as accusing Zerman of the crime of extortion. The "game" Peloso refers to means, as I read the text, the pattern of unsuccessful lawsuits described in the article. While it is clear that Peloso believes Zerman's suits to be meritless, it is also clear that the statement attributed to him does not amount to an accusation of criminal activity.

The statement that Zerman did not repay Bache and sued them instead also fails to rise to the level of an accusation of criminal activity, even when read together with the statement that Bache has still not received its money. Read in context, these statements merely relate the substance of the

dispute between the Zermans and Bache and reports on the then current status of the dispute. There is no suggestion that Zerman kept the money with the requisite intent to turn his possession of it into wrongful conversion. Indeed, the article reports the substance of Zerman's claim that Bache's purported error was, in fact, a wilful act designed to mislead him about his margin account.

Because none of the statements identified by Zerman clearly accuse him of criminal conduct, I dismiss the first count as against all defendants.[7]

*Count II*

■ The second count in the complaint, again directed at all defendants, identifies specific alleged misstatements of fact which he contends are actionable as libel. The misstatements all center on the status of pending appeals in three cases.[8] Zerman identifies the misstatements as:

(1) "... he sued Bache for fraud. The case was dismissed, and Mr. Zerman made several *UNSUCCESSFUL* APPEALS." (emphasis in complaint, but not in the original text).

Zerman contends that this statement is actionably false because his suit against Bache was not dismissed until the Supreme Court denied certiorari on November 7, 1983, almost three months after the article was published. He does not dispute, however, that the trial court had dismissed the action against Bache, that the Court of Appeals had affirmed the dismissal; that he had filed an unsuccessful petition for rehearing in the Court of Appeals; and that he unsuccessfully attempted to file two petitions for writs of certiorari with the Clerk of the Supreme Court. *See Zerman v. Jacobs*, 510 F.Supp. 132 (S.D.N.Y. 1981) (Weinfeld, J.), *aff'd without opinion*, 672 F.2d 901 (2d Cir.1981); Prozeller Aff., sworn to October 22, 1984, ¶ 6.

(2) "... she sued Hutton. Her case was dismissed, and she appealed UNSUCCESSFULLY." (emphasis in complaint).

Zerman contends that this statement is actionable libel because Mrs. Zerman was partially successful in her appeal to the Court of Appeals, and because the appeal was pending as of the date of publication.

(3) "... Mrs. Zerman sued Dean Witter. Again the case was dismissed, and again she appealed UNSUCCESSFULLY." (emphasis in complaint).

Zerman contends that this statement is actionable libel because Mrs. Zerman's appeal of the dismissal of her suit against Dean Witter was not affirmed until June 1, 1984. *See Zerman v. Melton*, 735 F.2d 751 (2d Cir.1984). However, he does not dispute that Mrs. Zerman had unsuccessfully moved the district court for reconsideration of its dismissal of the action against Dean Witter prior to publication of the article.

(4) "... Dean Witter recently filed a counter suit against Mrs. Zerman for costs and expenses, including attorneys fees. Mr. Peloso says Dean Witter did so because 'the Zermans will continue to file suit after suit unless and until effectively stopped.'"

Zerman contends that this statement is actionable libel because no counter suit was filed against Mrs. Zerman. He does not dispute, however, that Dean Witter had moved for an award of attorneys' fees in the Court of Appeals prior to the publication of the article.

(5) "... and why they continue to appeal when their cases are repeatedly dismissed."

Zerman contends that this statement is actionable libel because appeals were pending in all three cases at the time of publication. He does not dispute, however, that all three cases had been dismissed in the district court.

---

**7.** The first count of complaint contains reference to several other statements contained in the article, none of which can fairly be read to accuse Zerman of criminal conduct. The three statements discussed in the text are illustrative of the claims advanced in the first count, and are discussed for that purpose. I have examined both the complaint and the article, and I find as a matter of law that no statement contained in the article is actionable as a libelous accusation of criminal conduct.

**8.** The three cases at issue in the second count are: *Zerman v. Bache*, 80 Civ. 3570 (EW); *Zerman v. E.F. Hutton*, 82 Civ. 4527 (CLB); and *Zerman v. Dean Witter*, 82 Civ. 6846 (ADS), all filed in the Southern District of New York.

*New York privileges relating to legal proceedings*

New York recognizes two privileges that relate to legal proceedings, one for statements made in papers filed in the course of a legal proceeding and one for fair and true reports of legal proceedings.

The privilege accorded statements made in papers filed in judicial proceedings is grounded in New York caselaw from the late nineteenth century. The privilege was explained by the New York Court of Appeals in *Youmans v. Smith*, 153 N.Y. 214, 47 N.E. 265 (1897) in these terms:

A counsel, or party conducting judicial proceedings, is privileged in respect to words or writing used in the course of such proceedings reflecting injuriously upon others when such words and writings are material and pertinent to the questions involved ... within such limit, the protection is complete, irrespective of the motive with which they are used; but such privilege does not extend to matter having no materiality or pertinency to such questions. (citations omitted)

New York courts are liberal in determining whether a particular statement is "pertinent" to the judicial proceeding, being reluctant to "deprive its author of his privilege," because to take any stricter view of the question "would be an impediment to justice." *Id.*

The privilege accorded fair and true reports of judicial proceedings is statutory. Section 74 of the New York Civil Rights Law states:

*Privileges in action for libel*

A civil action cannot be maintained against any person, firm, or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

The scope of this privilege has been discussed by the New York Court of Appeals in these terms:

For a report to be characterized as 'fair and true' within the meaning of the statute, thus immunizing its publisher from a civil suit sounding in libel, it is enough that the substance of the article be substantially accurate ...

*Holy Spirit Assoc. v. New York Times*, 49 N.Y.2d 165, 424 N.Y.S.2d 165, 167, 399 N.E.2d 1185, 1187 (citation omitted)

A report is 'substantially accurate' if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth. *See Gurda v. Orange City Publications Division, Etc.*, 56 N.Y.2d 705, 451 N.Y.S.2d 724, 436 N.E.2d 1326 (1982); *Rinaldi v. Holt, Reinhart & Winston, Inc., supra*, 397 N.Y.S.2d at 952, 366 N.E.2d at 1308 (omissions of fact not actionable as libel unless the conclusion to be drawn from the report is significantly altered by the omissions).

Examining the statements complained of with these principles in mind, I conclude that the undisputed facts show that none of the statements constitute actionable libel. Accordingly, I grant defendants' motions for summary judgment.

The only arguable inaccuracy in the first statement lies in its reference to "several unsuccessful appeals" when, in fact, Zerman had only appealed and lost once in that case. He had also unsuccessfully moved for rehearing before the Court of Appeals, and had unsuccessfully petitioned for writs of certiorari twice prior to the articles publication. To an average reader those facts would create the same impression as would a second, third, fourth and fifth unsuccessful appeal.

The second statement contains a factual misstatement. Mrs. Zerman's appeal of the dismissal of her action against E.F. Hutton was pending at the time of publication. It could not therefore be "unsuccessful" as reported in the article. Considered in the context of the entire article, however, this misstatement does not affect the gist of the article.[9] The impression created

9. Defendants argue that since only Mrs. Zerman was involved in the E.F. Hutton action, and that only Mr. Zerman is plaintiff in the case at bar, any misstatement about the E.F. Hutton

by the article is that the Zermans had unsuccessfully sued several brokerage firms alleging similar acts of wrongdoing. That impression would not be changed if the article had accurately reported the status of Mrs. Zerman's E.F. Hutton appeal.

The third misstatement inaccurately characterizes an unsuccessful motion in the district court for reconsideration of dismissal of Mrs. Zerman's action against Dean Witter as an unsuccessful "appeal." Despite procedural differences between such a motion and an appeal which are immediately apparent to an attorney, an average reader's impression of the report would not be affected at all by the mischaracterization. It is, therefore, not actionable.

The fourth misstatement mischaracterizes a motion for double costs and attorneys' fees as a "countersuit for attorneys' fees." Again, despite the obvious procedural difference, the substance of the report is unaltered by the inaccuracy, which is therefore not actionable.

The fifth purported misstatement is not, strictly speaking, inaccurate. The Zermans' cases were "repeatedly dismissed" by the district courts. The fact that appeals were still pending in all three cases preserved the technical possibility that the Zermans could eventually succeed in one or more of the cases, but disclosure of that fact would not alter the impression created by the article. The statement is therefore not actionable.

*Count III*

In the third count, Zerman purports to assert a cause of action for "invasion of privacy." However, New York law does not recognize any "so-called common law right to privacy." *Arrington v. New York Times Co.,* 55 N.Y.2d 433, 440, 449 N.Y.S. 2d 941, 943, 434 N.E.2d 1319, 1321 (1982), *cert. denied* 459 U.S. 1146, 103 S.Ct. 787, 74 L.Ed.2d 994 (1983) (citation omitted). Protection against unauthorized use of one's name or image is found only in §§ 50 and 51 of the New York Civil Rights Law. *Ibid.* Newsworthy reports on matters of

public interest, a term the New York Court of Appeals has cautioned must be "freely defined," are not actionable under those sections. *Ibid; Lahiri v. Daily Mirror,* 162 Misc. 776, 295 N.Y.S. 382.

Accordingly, I grant defendants' motions to dismiss the third count in the complaint.

Moreover, even in jurisdictions which recognize a common-law right to be free from publicity which casts one in a "false light," a plaintiff must plead and prove that the "false light" would be highly offensive to a reasonable person and that the defendant acted with reckless disregard of the falsity reported. *See* Restatement of Torts (Second) § 652E (1977).

In light of the discussion above, I think it clear that plaintiff could not meet the standard for "false light" claims. The purportedly false statements are all substantially true, or their falsity does not effect the impression created by the article. Therefore, even if New York recognized a cause of action for false light invasions of privacy, plaintiff's complaint would be properly dismissed on defendants' motion for summary judgment. *See Arrington v. New York Times, supra.*

*Motion for leave to amend*

Plaintiff has filed a document captioned "Proposed Amended Complaint adding three new counts based on two new libels" apparently in response to this Court's order filed August 5, 1985 which declared that no defendant would be required to respond to a supplemental pleading unless plaintiff successfully moved to supplement the complaint pursuant to F.R.Civ.P. 15(d). Construing the document submitted as such a motion, I deny it on the grounds that it fails to state a claim upon which relief may be granted. F.R.Civ.P. 12(b)(6).

The proposed supplemental complaint focuses on allegedly libelous statements contained in a *Wall Street Journal* article published December 27, 1984 and in a *Miami Herald* article published December 29, 1984. Reading the proposed complaint lib-

---

suit is not "of and concerning" plaintiff in this action. *See Julian v. American Business Consultants, Inc.,* 2 N.Y.2d 1, 17, 155 N.Y.S.2d 1, 17, 137 N.E.2d 1, 12–13 (1956). While this conten-

tion appears to have substantial merit, I do not rely on the point in my decision to dismiss the claims based on statements about the E.F. Hutton suit.

erally, plaintiff complains of three allegedly libelous statements:

(1) That plaintiff is a "Florida lawyer."

(2) That plaintiff was "fined" $2,500 by the Court of Appeals in connection with his suit against Bache.

(3) That plaintiff "invested" the $10,000 in treasury bonds deposited with Bache which eventually led to his dispute with Bache.

All of these statements are substantially true under the standards discussed above in connection with count two of plaintiff's initial complaint.

Plaintiff is admitted to the bar of the State of New Jersey, and he is currently a resident of Florida. While the phrase "Florida lawyer" may initially leave the impression that plaintiff is admitted to practice law in Florida rather than a lawyer admitted elsewhere currently residing in Florida, the difference does not result in an actionably false impression.

The Court of Appeals ordered plaintiff to pay Bache $2,500 in damages pursuant to F.R.App.P. 38. Plaintiff's contention that the article's reference to this fact as an order to pay a $2,500 "fine" libelously implies he was convicted of a crime is meritless. The word "fine" does not necessarily implicate criminal violations of the law. It applies with equal force to forfeitures or penalties awarded an adverse party in a civil action. *See* Webster's New Collegiate Dictionary, G. & C. Merriam Co., Springfield Massachusetts, 1976. Therefore, use of the word "fine" does not amount to an actionably false statement in this context.

Plaintiff alleges, and defendants do not dispute, that he delivered the $10,000 in U.S. Treasury Bonds in response to a margin call on his account. Plaintiff concludes from this fact that the $10,000 was not an "investment" of $10,000. Even if plaintiff is right in contending that the word "investment" mischaracterizes his reasons for delivering the bonds to Bache, revelation of the complete circumstances would have no effect at all on the average reader's impression of the article. This statement is, therefore, not actionably false.

*Rule 11 motion*

■ All defendants move for an award of their costs and attorneys' fees pursuant to F.R.Civ.P. 11. An award under the Rule is proper if it is clear that a reasonable attorney (or *pro se* litigant) could not have certified after reasonable inquiry that positions advanced in the pleadings were both well grounded in fact and justified by existing law or by a good faith argument for the extension, modification or reversal of existing law, and that the pleadings were not interposed for any improper purpose.

In considering whether sanctions under Rule 11 are justified in this case, I must consider only the pleadings before me. Plaintiff's conduct in other actions where his pleadings were held to be frivolous and vexatious is irrelevant. *See e.g. Zerman v. Jacobs*, 80 Civ. 3570 (EW), slip. op. (S.D.N. Y. March 31, 1984); *Zerman v. Prudential–Bache*, 83 Civ. 7980 (CBM), slip op. (S.D.N.Y. May 3, 1984); *Zerman v. Jacobs*, (2d Cir.1986) [810 F.2d 1161 (Table) ].

Plaintiff's inquiry into the facts of this case are not at issue. He relies exclusively on the published and undisputed facts from which he draws disputed conclusions. If Rule 11 sanctions are proper, therefore, they must be based on the conclusion that plaintiff could not have advanced his claims with a good faith belief that they were warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.

Plaintiff could not have held a reasonable belief that liability could be based on the lawyers' statements reported in the article. Those statements are either clearly protected reports of judicial proceedings or clearly protected expressions of opinion. Plaintiff advances no argument, good faith or otherwise, that would support the modification or reversal of those protections. I therefore grant the motions of defendants Sullivan & Cromwell, and Sage Gray Todd & Sims and John F.X. Peloso collectively for attorneys' fees as a sanction under Rule 11.

Exercising my discretion to deter rather than to compensate fully, I direct that plaintiff pay $3000 in sanctions to Sullivan & Cromwell, and $3,000 to Sage Gray/Peloso.

Defendant Dow Jones & Company stands in a somewhat different posture. The article contained several factual errors attributable to noone other than the *Wall Street Journal.* While I agree with Dow Jones that the factual errors are not so significant as to alter the substantial truth of the article, I am unwilling to conclude that plaintiff could not have held a good faith belief that a court could be persuaded otherwise. For this reason, I decline to grant Dow Jones' motion for their full attorneys' fees as a sanction under Rule 11. *See Hansen v. Prentice-Hall, Inc.,* 788 F.2d 892 (2d Cir.1986).

It is clear, however, that some aspects of the complaint against Dow Jones are patently frivolous. For example, plaintiff's allegation that his rights under the 5th and 4th Amendments to the Constitution were violated by Dow Jones could not be advanced in compliance with Rule 11. However, I do not think I could make a meaningful order granting sanctions as to the frivolous aspects of the complaint and denying it as to the arguably incorrect factual statements contained in the article, so I do not attempt to do so. Accordingly, I deny Dow Jones' motion for sanctions.

*Conclusion*

Defendants' motions to dismiss the first count in the complaint are granted.

Defendants' motions for summary judgment on the second count are granted.

Defendants' motions to dismiss the third count are granted.

Plaintiff's cross motion for summary judgment is denied.

Plaintiff's motion for leave to file an amended complaint is denied.

Plaintiff is directed to pay $3,000 in Rule 11 sanctions to defendant Sullivan & Cromwell; and $3,000 to defendants Sage Gray Todd & Sims and Peloso collectively, for a total in sanctions of $6,000. Payment must be made within thirty (30) days of the date of this order, failing which defendants may submit judgments on five (5) days' notice.

The Clerk is directed to dismiss the complaint with prejudice and costs.

The foregoing is So Ordered.

APPENDIX A

<u>The Wall Street Journal</u>, August 15, 1983

# Couple's Suits Against Five Brokers Raise Tempers in New York, Florida Courtrooms

**By NANCY E. MARX**

*Staff Reporter of THE WALL STREET JOURNAL*

In recent years, courts have become more sympathetic to investors who sue their brokers for fraud. But that sympathy hasn't extended to Ernest and Evelyn Zerman.

Since 1980, the retired couple from Hallandale, Fla., has sued five investment firms, claiming that the brokers used their accounts to generate excessive commissions and that they made unsuitably risky investments.

Judges suspect the Zermans, however, of playing the courts instead of the market. To date, three of their suits have been dismissed, one has been settled and one is pending. Since most investors stop suing brokers after one unlucky gamble, the Zermans are unusual in their persistence.

Mr. Zerman, who practiced law for five years in the 1940s in New Jersey before going into the construction business, represents himself and his wife in court. He says he is litigating to prove a point.

"Customers can be easily wiped out of all their savings when buying on margin because they aren't fairly warned of the risks," he says. "Brokers try to stop investors from bringing suits to court, but I intend to bring my cases all the way to the Supreme Court."

**'Brokerage House Gadflies'**

While judges are losing their patience, brokers are losing their tempers. "The Zermans aren't aggrieved, wronged investors, but ubiquitous brokerage house gadflies, who under the guise of fraud allegations, have made a hobby of prosecuting brokers for investments gone sour," says attorney John F.X. Peloso in court papers. He represents Thomson McKinnon Securities Inc. in a Zerman suit pending in a federal court in Florida. He also represented Dean Witter Reynolds Inc. in a suit filed in a New York federal court and dismissed.

The Zermans also sued Prudential-Bache Inc., Cowen & Co., and E.F. Hutton in a New York federal court.

Dean Witter recently filed a counter-suit against Mrs. Zerman for costs and expenses, including attorneys' fees. Mr. Peloso says Dean Witter did so because "the Zermans will continue to file suit after suit unless and until effectively stopped."

It all started when Mr. Zerman opened a margin account—which allows one to buy stock on credit—with Bache in 1977, the year he retired and moved south. In 1980, he sued Bache for fraud. The case was dismissed, and Mr. Zerman made several unsuccessful appeals.

Judge Edward Weinfeld, who dismissed the Bache case, predicted that Mr. Zerman would persist in litigating. Branding Mr. Zerman's motions frivolous, he said: "This court is convinced that, unless precluded from doing so, plaintiff will continue to make similar groundless motions. . . ."

Mr. Zerman also opened an account with Cowen in 1977. In 1982, after the Bache suit was dismissed, he sued Cowen. A settlement was reached, but details of it aren't contained in court records, and it isn't clear if Mr. Zerman got any money in damages. Both Cowen's attorney and Mr. Zerman decline to comment on the settlement.

In 1980, while Mr. Zerman sued Bache, Mrs. Zerman opened accounts with Thomson McKinnon, Hutton and Dean Witter. In 1982, while her husband sued Cowen, she

---

*Ernest and Evelyn Zerman claim that the brokers used their accounts to generate excessive commissions, but judges suspect the couple of playing the courts instead of the market.*

---

sued Hutton. Her case was dismissed, and she appealed unsuccessfully.

After Hutton filed to dismiss, Mrs. Zerman sued Dean Witter. Again the case was dismissed, and again she appealed unsuccessfully. After Dean Witter filed to dismiss, she joined forces with her husband and sued Thomson McKinnon. The case is pending.

After all the activity, judges and brokers involved with the Zermans wonder why the Zermans keep investing when they keep losing money, and why they continue to appeal when their cases are repeatedly dismissed.

"The reason we continue investing is that we're dissatisfied with the brokers' practices, and we want to recoup our losses," Mr. Zerman says.

But lawyers for the five securities firms speculate that the Zermans have an ulterior motive. They say the couple aims to set up brokerage houses as securities fraud defendants to avenge a bookkeeping error that originally put the Zermans at loggerheads with Bache.

The error occurred in March 1980, when Mr. Zerman deposited six U.S. Treasury Bonds with Bache's Hallandale office. Five

of the bonds had a face value of $1,000 each, and one had a face value of $5,000. But Bache says its computerized accounting statement mistakenly characterized the five $1,000 bonds at $10,000 each, crediting Mr. Zerman with $55,000 instead of $10,000.

When Mr. Zerman received the statement, he didn't correct the error. Instead, he waited a month and then directed Bache to sell the bonds. He was sent a check for $57,730.01, reflecting the sale cost and interest. When Bache discovered the error, it demanded $47,234.57 from Mr. Zerman, the amount of the incorrect check minus the proceeds of his actual $10,000 investment.

**Liquidating an Account**

But Mr. Zerman didn't repay Bache. Instead, he sued the firm for liquidating his account due to lack of collateral. Mr. Zerman said he knew an error had been made but alleged, among other charges, that it was purposely designed to mislead him into believing that his account met margin requirements. The case was tossed out, and the judge ordered Mr. Zerman to obey the customer's agreement he signed with Bache in 1977, requiring settlement of disputes by arbitration.

Rather than arbitrate, Mr. Zerman filed an appeal with the Second Circuit Court. That court affirmed the federal court's decision and ordered Mr. Zerman to repay Bache.

But he still wouldn't repay Bache. Instead, he filed a petition for rehearing, but it was denied. Mr. Zerman was then ordered to cease filing motions until he arbitrated with Bache.

Bache's attorney, Bradley Prozeller, says Bache hasn't gotten its money yet. "Mr. Zerman has persisted in his lawsuit through a series of frivolous motions and petitions," he says. The fact that he accepted money not belonging to him "and tried to make off with the proceeds shows the frivolousness of his suit," he says.

Mr. Peloso, the attorney, says the cases are "all essentially indistinguishable," and that's why Mr. Zerman brought the latest case in Florida. "He undoubtedly hopes his name won't be recognized there, because he realizes his game is up in the Southern District of New York," Mr. Peloso says.

But Mr. Zerman denies that. "I originally tried my cases in New York because the firms are headquartered there," he says. I found the judges in New York biased in the brokers' favor, so I switched to Florida."

In several of the cases, lawyers have accused the Zermans of trying to prolong litigation in an effort to secure a settlement

*Please Turn to Page J6, Column 4*

# Florida Couple's Suits Against Brokers Raise Courtroom Tempers

Continued From Page 19

that would allow them to repay Bache. Mr. Zerman admits that he frequently asks for extensions, but says: "Federal securities litigation involves complex and lengthy issues of law and facts which prevent a proper response within the normal time."

In the Dean Witter case, Mrs. Zerman filed suit for damages of more than $100,000, claiming the "unconscionability of transaction on 10% margin, to an unsophisticated housewife, without even inquiring into her financial ability to meet inevitable margin calls, in the historically proven, wildly gyrating market."

Judge Abraham D. Sofaer found it "highly doubtful" that Mrs. Zerman was such a naive investor, particularly since she had sued Hutton two months earlier under similar circumstances. The judge also doubted that Dean Witter's broker engaged in excessive trading to enlarge his commissions, since only three transactions were made. He decided there wasn't any ground for Mrs. Zerman's claim that Dean Witter had gambled her money away.

For Mr. Peloso, who says his firm was coincidentally retained to defend both Dean Witter and Thomson McKinnon, the Zermans have been a source of headaches and humor.

"In their frenzy of firing off wave after wave of frivolous response, motions and appeals, the Zermans have become all mixed up by their various actions," he says. As evidence, he cites a submission in which the Zermans refer to an officer of Thomson McKinnon as the president of Dean Witter, and then erroneously refer to Mr. Peloso as attorney for that executive. Mr. Peloso calls these examples "smoking-gun evidence of the nuisance campaign being conducted."