FREEZE RIGHT REFRIGERATION AND AIR CONDITIONING SERVICES, INC., et al., Respondents, v CITY OF NEW YORK et al., Defendants, and NEW YORK TIMES COMPANY et al., Appellants.

First Department, April 24, 1984

### APPEARANCES OF COUNSEL

*Dean Ringel* of counsel (*Floyd Abrams* and *Kevin J. Burke* with him on the brief; *George Freeman* and *Cahill Gordon & Reindel,* attorneys), for appellants.

*Louis Venezia* of counsel (*Venezia & Haber,* attorneys), for respondents.

### OPINION OF THE COURT

SULLIVAN, J.

This libel action arises out of the publication of an article in the *New York Times* concerning an investigation by the New York City Department of Consumer Affairs into the sales practices of air-conditioner repair shops. The Times and its reporter, Ralph Blumenthal, appeal from the denial of their motion for summary judgment dismissing the complaint.

In May, 1978, the Department began an undercover investigation of air-conditioner repair shops, an investigation which, as the Department itself, as well as the *Times'* article noted, "was conducted in cooperation with *The New York Times.*" On July 5, 1978, 16 days prior to public release of the Department's findings, the *Times* published a news article, "Air-Conditioners: A Look At Repairs", written by Mr. Blumenthal who, at the time, was assigned to cover consumer affairs in New York City.

According to the article, the Department purchased a number of new 4,000 and 5,000 B.T.U. portable air conditioners, which were tested and certified to be in proper operating condition by Irving Bachrach, an expert in the repair of air conditioners. A single, easily visible wire was then disconnected on each unit, thereby rendering the cooling compressor inoperable, but leaving the fan working. Department investigators posing as customers thereafter presented the air conditioners for repair at randomly selected shops, among which was Freeze Right. After the "repairs" were made, the units were reinspected by Bachrach and the results recorded in the Department's official reports, which were the basis of the *Times'* article.

The article reported that 7 out of the 11 air-conditioner repair shops surveyed misdiagnosed the problem or

charged for unnecessary and costly repairs. Under 11 separate headings, each with the name of the shop and its address, the repairs found by Bachrach to have actually been performed at the shop were reported, as well as, in some cases, the comments by shop personnel after they were advised of the test findings by Blumenthal. The full text of the portion of the article concerning Freeze Right is as follows:

"Freeze Right Refrigeration, 1225 Foster Avenue, Brooklyn — Unit brought in June 5. Mr. Crichton [the Department investigator], calling for an estimate the next day, said he was told the fan motor 'was shot — you need a new fan motor.' The charge was set at $92.60, including $10 for the estimate. The unit was picked up June 9, and the bill, for $93, specified 'replace fan motor.' Mr. Crichton asked for the old motor back and was given what he was told was that motor.

"According to the post-service analysis, the terminal wire had been loosely restored. However, Mr. Bachrach [the Department expert] certified that 'the motor in the unit was the original and bore the identifying marks.' He added: 'The repair shop did not replace the motor as claimed.' Nor was the motor that had been returned to Mr. Crichton actually from his unit — it was made by Fasco Industries, according to its markings.

" 'The motor was changed,' insisted David Malina, the company's manager. He maintained later, however, that there had been a mistake in returning the proper motor to Mr. Crichton and that he now had the motor that had been removed from the unit. However, the serial number he cited did not match the one certified as the original."

Freeze Right was one of seven repair shops cited for alleged violations of the Consumer Protection Law.

After the *Times'* publication and the Department's subsequent release, Bachrach, prompted by Freeze Right's denial of the administrative charges and its attorneys' prepublication letter alerting the *Times* to Freeze Right's contention that a new motor had indeed been installed and that a lawsuit would be brought if the charges were published, reinspected the unit. Contrary to his initial finding that the motor in the repaired unit bore the original

markings, Bachrach concluded, on the basis of an extra lead wire, that the motor had indeed been replaced, but consistent with his earlier findings, he confirmed that the motor which had been returned was not the original. The *Times* refused to retract. Bachrach, who had been injured in an automobile accident at about the time the administrative hearings were to begin, died, and the charges against Freeze Right were dropped.

Freeze Right and four members of the Malina family[1] served a single cause of action complaint[2] seeking $10,000,000 in damages from the Times, Blumenthal, the City of New York and the Department. Simultaneous with the service of their answers, the Times and Blumenthal moved for summary judgment dismissing the complaint on the ground that the July 5, 1978 article was absolutely privileged under section 74 of the Civil Rights Law as a fair and accurate report of an official proceeding. The municipal defendants did not participate in that motion.

On February 6, 1980, Special Term (Tyler, J.), denied the motion on the ground that unresolved factual issues relating to the alleged participation of Mr. Blumenthal in the Department's investigation precluded a determination as to whether the allegedly libelous article was a report of an official proceeding.

In March, 1982, the municipal defendants moved to dismiss the complaint pursuant to CPLR 3211 (subd [a], par 7) on the basis of the absolute immunity that protects governmental agencies and officials from suits based on defamatory statements issued in the discharge of their official duties (see *Ward Telecommunications & Computer Servs. v State of New York,* 42 NY2d 289). Alternatively, they moved for summary judgment based on the qualified privilege that attaches to communications fairly made by persons or entities in the discharge of a private or public

---

**1.** Of the various named plaintiffs in this action, only Freeze Right and David Malina are mentioned in the *Times'* article. Since there is no indication that the article is "of and concerning" the other named plaintiffs, the complaint fails to state a cause of action as to them, and, accordingly, should have been dismissed. (See *Murray v Cassirer,* 17 AD2d 149; *Richman v New York Herald Tribune,* 7 Misc 2d 563.)

**2.** The complaint failed to set forth the particular words complained of. Instead, the entire *Times'* article was attached to the complaint as an exhibit. This is a defect which in itself is sufficient to warrant dismissal. (See *Seltzer v Fields,* 20 AD2d 60, affd 14 NY2d 624; *Gardner v Alexander Rent-A-Car,* 28 AD2d 667.)

duty, legal or moral (see *Shapiro v Health Ins. Plan,* 7 NY2d 56). The affidavit of the Department's staff attorney, which set forth in detail the sequence of events in the Department's investigation of Freeze Right, made it absolutely clear that neither the *Times* nor Mr. Blumenthal played any role whatever in the investigation or the preparation of the Department report.

Moreover, the affidavit also demonstrated that the only factual error in that report — that Freeze Right had not replaced the air-conditioner motor — was the result of a mistake by the Department's expert. The municipal defendants also established that this error was not discovered until after the issuance of the Department's press release and publication of the *Times'* article.

Utilizing the information contained in the municipal defendants' moving papers and Blumenthal's own sworn denial of any involvement in the Freeze Right investigation, the Times and Blumenthal cross-moved for summary judgment. As in their initial motion, they asserted the absolute privilege which attaches to a report of official proceedings under section 74 of the Civil Rights Law. In addition, for the first time, they moved on the basis of a constitutionally based qualified privilege. Plaintiffs opposed on the same ground as on the first motion, that the investigation had not been an official proceeding due to the *Times'* participation therein, and on the further ground that the Times' defendants should not be permitted fragmented and successive motions for summary judgment.

Special Term (Sklar, J.), granted the municipal defendants' motion, finding that, although they lost their absolute governmental immunity by virtue of the *Times'* participation in the investigation, they nonetheless, in communicating on a matter in the discharge of a public duty, enjoyed a qualified privilege that could only be overcome by a showing of common-law malice, which had not been, and could not be, demonstrated. Although expressly disclaiming any reliance on the doctrine of law of the case, Special Term nevertheless refused to consider the merits of the Times defendants' motion, citing the denial of the earlier motion and the judicial policy against entertaining multiple summary judgment motions in the absence of

newly discovered evidence or other sufficient cause. This appeal followed. We reverse and grant the Times defendants' motion for summary judgment.

Plaintiffs seek to justify Special Term's determination solely on two grounds — the policy against successive summary judgment motions in the absence of newly discovered evidence; and alleged inaccuracies in the *Times'* account, wholly outside the scope of the investigation, of Malina's explanation at the time Blumenthal contacted him, as well as Blumenthal's failure to investigate that explanation further.

Quite apart from the propriety of Special Term's determination that the Times defendants' motion is barred by the ruling on the earlier summary judgment motion, the law is clear that the prior denial of a similar motion "constitutes no impediment to an appellate court in the proper and just disposition of the motion on its merits, freed from any procedural stumbling block." (*Klein v Smigel,* 44 AD2d 248, 250, affd 36 NY2d 809; see *Adelphi Enterprises v Mirpa, Inc.,* 33 AD2d 1019; also *Northville Dock Corp. v Aller,* 15 AD2d 947.)

In any event, Special Term was not barred from a consideration of the merits of the motion even though, as it correctly found, the additional evidence submitted on the second motion did not constitute newly discovered evidence. The Department's staff attorney's affidavit, which clearly demonstrated that *Times'* personnel did not participate in the Freeze Right investigation, could have been obtained prior to the first motion; and Blumenthal was available to show that the *Times'* contribution to the investigation was limited to the purchase of a single air-conditioning unit. The absence of newly discovered evidence, however, is not a rigid bar to the making of a second summary judgment motion. Such a motion is permitted where, as in this case, "other sufficient cause" exists. (*Marine Midland Bank v Fisher,* 85 AD2d 905, and cases cited therein.)

By their motion the municipal defendants, independently of the Times defendants, brought before the court irrefutable evidence that, except for the purchase of a single air-conditioning unit, the *Times* was not involved in

the Department's investigation. This proof resolved the dispositive issue, as noted by Special Term on the earlier motion, as to the applicability of the absolute privilege. Thus, the cross motion provided, for the first time, a mechanism to dispose of the entire case. Moreover, the policy against multiple summary judgment motions has no application where, as here, the first motion, made before discovery, is denied on the ground of the existence of a factual issue which, through later uncovering of the facts, is resolved or eliminated. (See *Jet Asphalt Corp. v New York Post Corp.,* 4 Media L Rep 1156, affd 63 AD2d 890.) These unusual circumstances warranted a departure from the rule prohibiting successive summary judgment motions.

Finally, courts should not be oblivious to the crippling financial burden which the defense of libel claims entails, even for major news organizations, and the consequent chilling effect this burden can have on the dissemination of news. (*Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 384; see Garbus, Libel Law: 20 Years After New York Times v. Sullivan, NYLJ, March 9, 1984, p 1, col 3, p 4, col 1.) " 'The threat of being put to the defense of a lawsuit * * * may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself' [citations omitted]." (*Karaduman v Newsday, Inc.,* 51 NY2d 531, 545.) Courts therefore should be loathe to sustain a meritless action upon purely procedural grounds.

■ The first two paragraphs of the *Times'* article clearly fall within the protection of section 74 of the Civil Rights Law, which confers an absolute privilege on a fair and true report of any official proceeding.[3] The argument that they did not, premised upon plaintiffs' contention and Special Term's acceptance of same, at an early stage in the action, that the proceeding lost its official character as a result of the *Times'* involvement in the investigation, has been shown to be meritless. That involvement, limited to the purchase of a single air-conditioning unit unrelated to the

---

**3.** In pertinent part, section 74 of the Civil Rights Law provides: "A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published."

Freeze Right test, and to being advised as to the pendency, progress and findings of the investigation even prior to their public release, did not affect in any way the conduct of the investigation or its outcome. Thus, it cannot detract from the official character of the proceeding.

Nor does a newspaper article which relies upon the findings of an official proceeding lose the protection of the statute merely because its publication precedes release of the official findings. Even the announcement of an investigation by a public agency, made before the formal investigation has begun, is protected as a report of an official proceeding within the contemplation of the statute (see, e.g., *Murphy v News Syndicate Co.,* 12 NY2d 1092), as is a report of an ongoing investigation (see, e.g., *Farrell v New York Evening Post,* 167 Misc 412, 415; also *Weiner v Weintraub,* 22 NY2d 330, 331-332; *Baumann v Newspaper Enterprises,* 270 App Div 825), as long as it is accurate. Here, of course, the *Times'* article reported on a completed investigation; each of the reports upon which it relied predated the article. Furthermore, the activities of the agency need not be public for the statutory privilege to apply. The report is protected as long as it concerns activities which are within the prescribed duties of a public body. The test is whether the report concerns "action taken by a person officially empowered to do so." (*Farrell v New York Evening Post,* 167 Misc, at p 416.)

It is beyond dispute that the Department, legislatively established by section 2201 of the New York City Charter (1976), is an official body whose investigation into alleged improper sales practices among air-conditioner repair shops constitutes an official proceeding within the meaning of the statute (see New York City Charter, § 2203, subd [d]). As in the case of the newspaper article referring to intelligence documents released by the House Subcommittee on International Organizations (*Holy Spirit Assn. v New York Times Co.,* 49 NY2d 63), or the testimony of a witness at a State Crime Commission hearing (*Gregory v Daily Gazette Co.,* 22 AD2d 846), a newspaper account of the investigative reports and findings of the Department of Consumer Affairs is entitled to the statutory privilege.

It is also beyond dispute that the first two paragraphs of that part of the *Times'* article which relates to Freeze Right are a fair and true report of the investigation. Judicial interpretation of section 74 has made it clear that an article need not be a verbatim account or even a precisely accurate report of an official proceeding to be a "fair and true report" of such a proceeding. (*Briarcliff Lodge Hotel v Citizen-Sentinel Pubs.*, 260 NY 106; *Holy Spirit Assn. v New York Times Co.*, 49 NY2d, at p 67; *George v Time, Inc.*, 259 App Div 324, affd 287 NY 742.) The *Times* and Blumenthal, however, need not avail themselves of the full extent of the liberality exercised by the courts in interpreting section 74 since comparison of the Department's reports and the material in the first two paragraphs of the article relating to Freeze Right reveals that the article either directly quoted from Department documents or summarized them almost verbatim. The only inaccuracy in the first two paragraphs of that part of the *Times'* article dealing with Freeze Right was due to the mistake of Mr. Bachrach, the Department's expert. Section 74, however, was designed precisely to protect the publisher of a fair and true report from liability for just such an error and to relieve it of any duty to expose the error through its own investigation.

On the other hand, Blumenthal's account of Malina's denial, the clear import of which was that Malina was lying, is not entitled to the statutory privilege since it is the product of Blumenthal's own research after learning of the Department's findings. Any discussion between Blumenthal and Malina is a matter dehors the scope of the official investigation. In relevant part, section 74 also provides: "This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof." Thus, in order for the entire article to be beyond the reach of this complaint, recourse must be had to some doctrine in the law of defamation other than the absolute statutory privilege accorded to a report of an official proceeding.

In alleging that the Times defendants acted in a "grossly irresponsible manner, without due consideration for the

standards of information gathering", plaintiffs implicitly acknowledge that the article dealt with a matter of public interest and thus that the fault standard of liability. adopted in *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196) applies. While defamation was a tort of strict liability at common law (see *Herbert v Lando,* 441 US 153), the law is now well settled that some degree of fault is required before liability may be imposed for media defamation. (*Gertz v Robert Welch, Inc.,* 418 US 323; *New York Times Co. v Sullivan,* 376 US 254.) As long as they do not impose liability without fault, the Supreme Court has left it to the States to "define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."[4] (*Gertz v Robert Welch, Inc.,* 418 US, at p 347.) In *Chapadeau v Utica Observer-Dispatch* (38 NY2d 196, *supra*), the Court of Appeals set the New York standard, "[W]here the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." (*Supra,* at p 199.)

The content of the *Times'* article is plainly within "the sphere of legitimate public concern," and, certainly, an official investigation of the dishonest practices employed by some air-conditioner repair shops warrants public exposition. In preparing the article Mr. Blumenthal, a reporter with more than 15 years experience with the *Times,* relied on facts from an authoritative official source, the Department of Consumer Affairs. Indeed, except for Blumenthal's account of his conversation with Malina, the Freeze Right section of the article is, as already noted, virtually a verbatim account of the contents of the Department's report. Reliance on such a reputable source is fully consonant with responsible journalism.

---

4. For purposes of this appeal, we assume that plaintiffs are private figures to whom the more rigorous "actual malice" standard — proof of knowing falsity or reckless disregard — which public figures must meet, does not apply.

Even when the sources are far less authoritative than the report of an official agency, New York courts have not hesitated to find that no triable issue exists. Thus, in *Carlucci v Poughkeepsie Newspapers* (88 AD2d 608, affd 57 NY2d 883), a newspaper, relying on information obtained as a result of a telephone call to a police barracks, falsely reported that a man arrested on gambling charges was the owner of the corporate plaintiff's grocery store. In dismissing the complaint, the court held that reliance on such information did not constitute gross irresponsibility.

Similarly, in *Robart v Post-Standard* (74 AD2d 963, affd 52 NY2d 843), a newspaper, relying solely on inaccurate information provided by a public information officer at a police barracks, reported that the plaintiff had been arrested and charged with a crime. In dismissing the complaint the court held, "[t]he reporter would have no reason to doubt the accuracy of the information supplied and relying upon it did not demonstrate gross irresponsibility" (*supra,* at p 963). Indeed in *Chapadeau* (*supra*), itself, the court held that gross irresponsibility was not shown by the newspaper's reliance on information provided by police authorities.

Even as to the reporting of Malina's denial plaintiffs fail to raise any factual issue. Before preparing the present article, Blumenthal examined the Department's official records — the log of preservice analysis, the investigator's affidavit, an invoice pertaining to Freeze Right, the log of postservice analysis, and portions of the service log relating to the work done by Freeze Right. After reviewing these materials, Blumenthal solicited Malina's comments, and reported his denials of the Department's charges. Blumenthal also reported Malina's assertion that he still had the original motor and, by including his reference to a serial number, implied that Malina was willing to show the motor to him. These are hardly the actions of an irresponsible journalist. To the contrary, they bespeak a careful and diligent effort consistent with responsible information gathering.

It should be noted that on neither motion did Malina deny that he furnished a serial number which did not match the one certified as the number of the original

motor. A trial is hardly necessary to determine whether sound journalistic practice required Blumenthal to meet with Malina, as plaintiffs contend, after the latter had admittedly returned a motor which, although purported to be the replaced motor, was not, and then gave an incorrect serial number when that fact was called to his attention.

In order to defeat the Times defendants' claim to the protection of the constitutional privilege on a summary judgment motion, plaintiffs were required to raise a triable issue of fact on the question of whether the conduct of these defendants was grossly irresponsible. (*Brown v Johnson Newspapers Corp.*, 84 AD2d 636; *Robart v Post-Standard*, 74 AD2d 963, *supra; Grobe v Three Vil. Herald*, 69 AD2d 175, affd 49 NY2d 932.) Plaintiffs have not done so. Although the complaint alleges that the Times and Blumenthal "failed to take proper steps to ascertain whether the matter was true or false" and "acted in a grossly irresponsible manner", plaintiffs have failed to come forward with any evidence to support these characterizations. Bald assertions in a pleading or unsupported allegations in affidavits are no substitute for proof and, when challenged, as here, do not raise triable issues of fact. (*Karaduman v Newsday, Inc.*, 51 NY2d, *supra*, at p 540; *Brown v Johnson Newspapers Corp.*, 84 AD2d, at p 636.)

The Times defendants urge, as an alternative nonconstitutional ground for dismissal, that the article is protected by the common-law qualified privilege that attaches to communications made in good faith to protect the public interest (see, e.g., *Mercedes Benz v Finberg*, 58 AD2d 808, 809; see, also, *Stillman v Ford*, 22 NY2d 48, 53; *Reliance Ins. Co. v Barron's*, 442 F Supp 1341, 1345). The privilege is overcome only by a showing that the publication was motivated by common-law actual malice, i.e., ill will or culpable recklessness. (*Stukuls v State of New York*, 42 NY2d 272, 279; *Stillman v Ford*, 22 NY2d, at p 53.) This argument was never advanced at Special Term. Since plaintiffs were never afforded the opportunity to confront the issue of common-law malice with respect to the Times defendants, we decline to consider the argument, whatever its merits.

Accordingly, the order of the Supreme Court, New York County (Sklar, J.), entered February 10, 1983, which denied the Times defendants' cross motion for summary judgment dismissing the complaint should be reversed, on the law, with costs and disbursements, and the cross motion granted.

KUPFERMAN, J. P., SANDLER, SILVERMAN and BLOOM, JJ., concur.

Order, Supreme Court, New York County, entered on February 10, 1983, unanimously reversed, on the law, and the cross motion granted. Appellants shall recover of respondents $75 costs and disbursements of this appeal.