# CORPORATE TRAINING UNLIMITED, INC., Donald M. Feeney, Jr., and Judy G. Feeney, Plaintiffs,

v.

# NATIONAL BROADCASTING COMPANY, INC., Defendant.

No. 93–CV–4756 (RJD).

United States District Court, E.D. New York.

Dec. 1, 1994.

Robert K. Erlanger, New York City, for plaintiffs.

Gayle Chatilo Sproul, Karen A. Estilo, National Broadcasting Co., Inc., New York City, for defendant.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

### Preliminary Statement

Plaintiffs Corporate Training Unlimited, Inc. ("CTU"), Donald M. Feeney, Jr., and Judy G. Feeney bring this action against defendant National Broadcasting Company, Inc. ("NBC") alleging defamation and intentional interference with prospective business advantage. This action arises out of a televised report broadcast on DATELINE NBC ("DATELINE") at 10:00 p.m. on Tuesday, March 23, 1993. The relevant segment ("the Broadcast") was entitled "Rambo Goes to Reykjavik." NBC moves to dismiss plaintiffs' complaint and, with respect to a single issue, moves for summary judgment. For the reasons provided below, defendant's motions are denied.

### Background

Plaintiff CTU is a privately-held international security corporation which specializes, among other things, in attempting to rescue American children who have been abducted overseas by a non-custodial parent. (Compl. ¶¶ 3–5.) Plaintiff Donald Feeney is CTU's President; Judy Feeney is CTU's Executive Vice President. (Compl. ¶¶ 8, 11.) According to the complaint, CTU has successfully returned American children to the United States from Tunisia, Jordan, Bangladesh, Sweden, Peru, and Ecuador. (Compl. ¶ 7.) Defendant NBC produces DATELINE, a television magazine broadcast weekly throughout the United States. (Compl. ¶ 15.) The Broadcast in question was seen by a viewing audience estimated at 13.3 million households, or approximately 36 million people. (Compl. ¶ 18.)

504

### The Broadcast

The subject of the DATELINE segment was an attempted child rescue mission organized and carried out by CTU. In late 1992, CTU was retained by two American citizens, Fred Pittman and Brian Grayson. (Compl. ¶¶ 28–32.) Pittman and Grayson were seeking to locate and then repatriate their daughters, who, contrary to American court order, had been taken to Iceland by their Icelandic mother, Erna Eyjolfsdottir (Erna Pittman Grayson). (Compl. ¶ 21.) The mission ended unsuccessfully, with the two daughters remaining with Eyjolfsdottir in Iceland, while CTU President Donald Feeney and Brian Grayson were apprehended by Icelandic police and later tried and convicted of kidnapping in Iceland. (Compl. ¶ 39.)

The Broadcast, captioned "Rambo Goes to Reykjavik," is approximately 15 minutes long. The segment begins with a short lead-in by NBC's Stone Phillips: "[Reporter] Brian Ross has the improbable tale of a commando group that, to one desperate father, seemed like the perfect way to get his daughter back from his ex-wife." (Tr. at 8.) The Broadcast consists primarily of a series of excerpts from interviews of the participants, interspersed by voiceover commentary supplied by Ross. In order of appearance, the individuals quoted on the Broadcast include 1) Erna Eyjolfsdottir, the Icelandic mother of Elizabeth Pittman and Anna Grayson; 2) Brian Grayson, the American father of Anna and one-time husband of Erna Eyjolfsdottir; 3) Donald Feeney, CTU's President and a plaintiff in this action; 4) Olbia Grayson, Brian Grayson's mother; 5) Ginger Grayson, Brian Grayson's current wife; 6) Elizabeth Pittman, the daughter of Erna Eyjolfsdottir and Fred Pittman; and 7) Judy Feeney, CTU's Executive Vice President and a plaintiff in this action.

The Broadcast begins with images of Erna Eyjolfsdottir and Brian Grayson as they separately describe their marriage and its breakup. The result was what Ross terms "an ugly and bizarre fight" over the custody of five-year-old Anna, the daughter of Eyjolfsdottir and Grayson, and eleven-year-old Elizabeth, the daughter of Eyjolfsdottir and

her first husband, Fred Pittman. (Tr. at 8.) Ross then introduces plaintiffs as "a group of self-styled American commandos who have gained great fame, going around the world with their own kind of solution for complicated international custody cases like the one involving Etna[1] and Brian." The video segment during this introduction is described in the transcript as "Footage of men driving car; commandos training." (Tr. at 8.) The image on screen is a car swerving at high speed, screeching and spinning to a halt, while individuals, many clad in army fatigues, are shown training in military-style maneuvers.

After this introduction, plaintiffs CTU and Donald and Judy Feeney are referred to frequently throughout the Broadcast. First, the Graysons describe retaining plaintiffs after having seen them on a television talk show. Four minutes into the Broadcast, narrator Ross then states, "Over the next three months, Mrs. Grayson would send the Feeneys some $40,000 to get the children back." (Tr. at 9.) During the next shot an off-camera voice yells "Fire," while the viewer sees a close-up of the hands of various individuals who are firing weapons at a target during what is presumably a combat training session. The voiceover then describes plaintiffs: "Operating out of Fayetteville, North Carolina, Donald and Judy Feeney run a company that trains corporate security guards. The company has been in bankruptcy since 1991—the Feeneys say because they lose money helping American parents." Shortly thereafter, Ross continues the voiceover: "Feeney is a former decorated Delta Force commando, who was part of the failed mission to rescue American hostages in Iran.... Feeney was forced to leave the military in 1986 for less-than-satisfactory-service—what Feeney calls some 'minor financial improprieties.'" (Tr. at 10.)

The Broadcast continues with a description, as provided by Ross, Eyjolfsdottir, and the Graysons, of the CTU plot to retrieve Anna and Elizabeth from Iceland to the United States. (Tr. at 10–13.) The Broadcast describes the way the "American com-

---

1. Throughout the Broadcast, Ross refers to "Etna" as opposed to "Erna" Eyjolfsdottir.

mandos' bungled mission" culminated in the arrest of Donald Feeney and Brian Grayson. (Tr. at 13.) Brian Grayson and his daughter Anna were stopped at the airport in Iceland before they could catch a plane out of the country; Elizabeth was returned to her mother after the "other commandos who flew off to Europe" with her were detained by authorities in Luxembourg. (Tr. at 12.) Ross then adds, "We talked with the Graysons last week, just before the Supreme Court of Iceland held up [sic] Brian's conviction and ordered him to prison for two more months. The Graysons say they now regret ever getting involved with the commandos, and they are beginning to wonder if the Feeneys told them the truth, especially about what happened to all the money the Graysons gave them." (Tr. at 13.)

Next, Ross and the Graysons discuss some of the Feeneys' requests for money, including requests for additional funds so that a private jet could be hired that would be big enough to transport Grayson and his child, along with a crew from "60 Minutes." (Tr. at 13.) Ross reports that no private jet was ever hired. (Tr. at 14.) The Broadcast continues with Ross stating: "Now back in the United States, Feeney's wife, Judy, in one final twist, claims there was no kidnapping, no law broken, because Etna was in on the scheme, and had been paid [$5,000] to let the children go." (Tr. at 14.) Erna Eyjolfsdottir is then quoted as denying the accusation. Then Ross adds in a voiceover, "Authorities in Iceland agree. And for Etna, the story about $5,000 to sell Anna and Elizabeth is the final outrage, the final lie, from a group of Americans who some call heroes." There is footage of the children coloring, then a close-up of Eyjolfsdottir: "What they did to me and my children, I do not see any heroes. I see people that lie and destroy lives. I don't see any heroes at all." (Tr. at 14.)

In the last minute or so of the Broadcast, NBC provides a summary. The exchange between Ross and Stone Phillips begins as follows:

*ROSS:* Tonight, both Don Feeney and Brian Grayson are in prison in Iceland: Grayson for two months; Feeney, the commando, for two years. Feeney and his wife,

Judy, say this is the first time one of their missions has failed. And over the last few days, we've heard from the families of five children who the Feeneys have brought back to this country, families which have nothing but praise for the way the Feeneys operate. Stone:

*PHILLIPS:* But the tactics, I would have to say, are unlike any commando tactics I've ever seen, Brian.

*ROSS:* Well, that's what the Graysons are saying now. They wonder about these champagne tactics, all the limousines and the hotels and the first-class lifestyle.

(Tr. at 14–15.) After further discussion, the Broadcast ends with the words of Brian Ross: "There are some 4500 American children in similar cases, but the State Department says going the route of the commandos is folly; that in fact, you're better off spending the money on lawyers in the country where the child might be." (Tr. at 15.)

*The Complaint*

Plaintiffs assert four claims for relief: 1) that during the Broadcast NBC defamed plaintiff CTU; 2) that during the Broadcast NBC defamed plaintiff Donald Feeney; 3) that during the Broadcast NBC defamed plaintiff Judy Feeney; and 4) that NBC intentionally interfered with plaintiffs' prospective business advantage by using the Broadcast to destroy a television production deal between CTU, the Feeneys, and Multimedia Television Productions, Inc.

In paragraph 67 of the complaint, plaintiffs allege the following:

67. Through statements, portrayals, depictions, and implications, the Broadcast defamed CTU, Don Feeney, and Judy Feeney in the following ways, among others:

(a) Falsely and continuously referring to and characterizing CTU operatives and the Feeneys as "Rambo"s.

(b) Falsely and continuously referring to, characterizing, portraying, and depicting CTU operatives and the Feeneys as violent.

(c) Falsely portraying and depicting CTU and the Feeneys to be violent in the context of a child custody case.

(d) Falsely stating that the Feeneys and CTU supply "simple," violent solutions to "complex" custody cases.

(e) Falsely stating that CTU had been in bankruptcy since 1991.

(f) Falsely stating that Don Feeney had been forced to leave the Army.

(g) Falsely implying that Don Feeney had been dishonorably discharged from the Army.

(h) Falsely using Don Feeney's own words to state that he had admitted committing financial improprieties in the military.

(i) Falsely implying that Don Feeney and Judy Feeney are financially dishonest.

(j) Falsely implying that CTU and the Feeneys prey on desperate parents.

(k) Falsely implying that CTU and the Feeneys are incompetent.

(l) Falsely stating that the Feeneys and CTU lied on numerous occasions.

(m) Repeating and publishing Eyjolfsdottir's defamatory and false statements.

(n) Falsely implying that a CTU operative had given Eyjolfsdottir sleeping pills.

(o) Falsely implying that CTU and the Feeneys either stole or dishonestly used the Grayson's money.

(p) Falsely implying that CTU and the Feeneys had lied about the reason for requiring an extra $10,000.

(q) Falsely implying that CTU and the Feeneys had concocted a story about the "60 Minutes" camera crew wanting to accompany them on the mission.

(r) Repeating and publishing the Graysons' defamatory and false statements.

(s) Falsely stating that the Graysons regretted getting involved with the Feeneys.

(t) Falsely stating that the CTU rescue operation fell apart when Brian Grayson had arrived in Iceland because of the "movie scam."

(u) Falsely stating that "all the spending quickly backfired" when a local newspaper broke the story about "Rambo."

(Compl. at ¶ 67(a)–67(u).)

**Discussion**

*Standard of Review*

With respect to a single issue—the statement in the Broadcast concerning the circumstances of Donald Feeney's departure from the Army—defendant seeks summary judgment. In all other respects, this is a motion to dismiss for failure to state a claim.

■ It is axiomatic that in the context of a 12(b)(6) motion, plaintiffs' complaint is construed generously, while defendant's motion to dismiss is subject to rigorous examination. *See, e.g., Conley v. Gibson,* 355 U.S. 41, 45–48, 78 S.Ct. 99, 101–03, 2 L.Ed.2d 80 (1957). The standard for summary judgment is equally familiar. Summary judgment is appropriate if, "'after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.'" *United States v. All Right, Title & Interest in Real Property,* 901 F.2d 288, 290 (2d Cir.1990) (quoting *Murray v. National Broadcasting Co.,* 844 F.2d 988, 992 (2d Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988)).

*Defamation*

Under New York law, which is applied in this diversity suit, a statement is defamatory—that is, actionable *per se*—if it tends to expose plaintiffs "to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of [them] in the minds of right-thinking persons...." *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 949, 366 N.E.2d 1299, 1305, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977) (quoting *Sydney v. MacFadden Newspaper Pub. Corp.,* 151 N.E. 209, 210 (1926)). In addition, a statement is libelous if it affects plaintiffs in their "profession, trade, or business by imputing to [them] any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof." *Davis v. Ross,* 754

F.2d 80, 82 (2d Cir.1985) (quoting *Four Star Stage Lighting, Inc. v. Merrick*, 392 N.Y.S.2d 297, 298 (1st Dep't 1977)). Indeed, under New York law, it is well settled that a statement which *"tends to disparage* [plaintiffs] in the way of [their] office, profession, or trade" is libelous *per se. Davis*, 754 F.2d at 82 (citing *Nichols v. Item Publishers, Inc.*, 309 N.Y. 596, 600, 132 N.E.2d 860 (1956)).

NBC offers several threshold arguments in urging dismissal of plaintiffs' complaint at the outset of the litigation. Defendant argues that the statements or implications are not defamatory because they: (1) are incapable of bearing a defamatory meaning or simply do not arise from the Broadcast; (2) are protected by the fair report privilege; and (3) are non-actionable expressions of opinion.[2]

*Defamatory Meaning*

■ NBC's first argues that a number of the allegedly defamatory statements are, as a matter of law, "devoid of defamatory meaning." (Defendant's Mem. at 19.) In a defamation action, the Court must make a threshold determination whether the contested statements are susceptible of one or several meanings. *Davis*, 754 F.2d at 82 (citation omitted). If the statement is susceptible of more than one meaning, it is for the jury to determine in which sense the words were used, *Davis*, 754 F.2d at 82 (citations omitted), and the Court cannot properly dismiss the action as a matter of law so long as one possible interpretation of the statement is defamatory. *Davis*, 754 F.2d at 85. If, however, the Court determines that the contested statements are reasonably susceptible of only one meaning, the Court must in turn decide whether the statements are "reasonably susceptible of the defamatory meaning

ascribed to them by plaintiff[s]." *Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 592, 550 N.Y.S.2d 251, 549 N.E.2d 453 (1989).

■ This threshold determination requires the Court to interpret the words naturally and in context. "The words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed." *Davis*, 754 F.2d at 83 (quoting *November v. Time, Inc.*, 13 N.Y.2d 175, 178–179, 244 N.Y.S.2d 309, 194 N.E.2d 126 (1963)). Moreover, television broadcasts add new and potentially significant variables to the defamation analysis. *See Lasky v. American Broadcasting Companies, Inc.*, 631 F.Supp. 962, 970 (S.D.N.Y. 1986). Courts must scrutinize the juxtaposition of the audio and video portions of a television program. In subtle ways, a television director can alter the tone of an otherwise innocuous broadcast. With the emerging popularity of self-styled "magazine" news programs, courts should be sensitive to the possibility that a transcript which appears relatively mild on its face may actually be, when the total mix of creative ingredients are considered, highly toxic. Indeed, a clever amalgamation of half-truths and opinion-like statements, adorned with orchestrated images and dramatic audio accompaniment, can be devastating when packaged in the powerful television medium.

■ NBC has extracted four of the challenged statements arguing that, as a matter of law, they are "devoid of defamatory meaning."[3] (Defendant's Mem. at 19.) The Court sees little value to this exercise, particularly at this early stage of the proceedings. For instance, defendant essentially urges the

---

**2.** Defendant also urges the Court to hold that defamatory implications cannot arise from statements that are privileged or substantially true and that plaintiffs' allegations are subject to the *"incremental harm"* doctrine. (Defendant's Mem. at 34–39.) Having rejected defendant's arguments that all the statements in the Broadcast are either privileged or substantially true, the Court does not reach these issues.

**3.** These statements are:

(a) Alleged references to plaintiffs as 'Rambos.' (Compl. at ¶ 67(a).)
(b) The statement that the Graysons regretted get involved with plaintiffs. (Compl. at ¶ 67(s).)
(c) The statement that the CTU rescue operation fell apart when Brian Grayson had arrived in Iceland because of the "movie scam." (Compl. at ¶ 67(t).)
(d) The statement that "all the spending quickly backfired" when a local newspaper broke the story about "Rambo." (Compl. at ¶ 67(u).)

Court to proclaim that, as a matter of law, calling someone "Rambo" cannot be defamatory. In order to make this pronouncement, NBC asks the Court to take judicial notice of the "Rambo" character: "a movie hero who attempts to accomplish positive ends through action-packed means." (Defendant's Mem. at 18.) Not surprisingly, plaintiffs characterize Rambo somewhat differently, depicting him as a "fictional psychopath" who, "[t]hroughout the three 'Rambo' movies, ... routinely blows to bits and otherwise liquidates various characters." (Compl. ¶ 20.) The Court declines the parties' invitation to enter this lofty debate. To be sure, plaintiffs' complaint contains a laundry list of allegations, some of which are strained and implausible, and could not, on their own, form the predicate of a defamation action. Nonetheless, having reviewed the transcript and viewed the Broadcast, the Court finds other references, when considered in full context, are reasonably susceptible of a defamatory meaning. Certainly, the ordinary member of the viewing public could have been left with the impression of plaintiffs as charlatans and ruffians with questionable financial integrity and business judgment. Accordingly, the Court rejects NBC's first ground for dismissal of the complaint.[4]

## The Fair Report Privilege

■ NBC also argues that plaintiffs' complaint should be dismissed because most of the statements alleged to be defamatory are protected by the fair report privilege, as codified by Section 74 of the New York Civil Rights Law. Section 74 provides in relevant part:

A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of a judicial proceeding, ... or for any heading of the report which is a fair and true headnote of the statement published.

N.Y.Civ.Rights Law § 74 (McKinney 1992). NBC claims that many of the allegedly defamatory statements or implications regarding CTU's scheme to regain custody of the children are privileged under Section 74 as fair reports of the Icelandic court proceedings at which plaintiff Donald Feeney and non-party Brian Grayson were tried and convicted.

NBC's employs the following logic. By plaintiffs' own admissions in the complaint, a DATELINE reporter attended the criminal proceedings in Iceland. (*See* Compl. at ¶¶ 44, 47, 51.) Since the DATELINE reporter attended some of the proceedings and "participated in the preparation of a report at least in part on her observation of those proceedings," NBC contends that the Section 74 privilege properly attaches, at least to those facts in the Broadcast that were also "testified to by witnesses in the Icelandic criminal court." (Defendant's Reply Mem. at 11–12.)

■ This argument misapprehends the nature of the fair report privilege. Section 74 does confer an absolute privilege on a fair and true report of a judicial proceeding. *See Freeze Right Refrigeration and Air Conditioning Services, Inc. v. New York*, 101 A.D.2d 175, 475 N.Y.S.2d 383, 388 (1st Dep't 1984). Moreover, there will often be minor discrepancies between what occurs in court and what is actually reported: "[f]or a report to be characterized as 'fair and true' within the meaning of the statute, thus immunizing its publisher from a civil suit sounding in libel, it is enough that the substance of the article be substantially accurate." *Holy Spirit Ass'n for Unification of World Christianity v. New York Times, Co.*, 49 N.Y.2d 63, 67, 424 N.Y.S.2d 165, 399 N.E.2d 1185 (1979). Nonetheless, the Court finds the defense to be unavailable here. The statute, by its very terms, protects only *reports of judicial proceedings*. The Broadcast does not even purport to be a report of the Icelandic[5]

---

4. By the same token, the Court rejects defendant's argument that "some of the alleged implications do not arise" from the Broadcast. It is both premature and unnecessary to comb through the complaint to pronounce which implications do, and which do not, emanate from the Broadcast.

5. The fact that this was an Icelandic, as opposed to American, trial raises an intriguing question: whether the section 74 privilege applies with equal force to reports of *foreign* judicial, legislative, or official proceedings. When the Court raised the point during oral argument, NBC asserted that the privilege does indeed extend to

trial. Rather, the story is told in narrative fashion, relating the "improbable tale" of "ace commandos" who "turned out to be more like the gang that couldn't do anything right." (Tr. at 8.) Thus, the way the Broadcast is stylized—as a succession of interviews with participants in the incident—belies the notion that NBC was even attempting to provide a fair and true report of a judicial proceeding.

Plaintiffs' argument, therefore, that NBC is unfairly attempting to "back-in" the facts from the Icelandic trial transcripts into the Broadcast has significant force. In the other cases to which Section 74 has been applied, the connection between the challenged report and the judicial, legislative, or official proceeding in question has been far more direct. *See e.g. Holy Spirit*, 49 N.Y.2d at 65, 424 N.Y.S.2d 165, 399 N.E.2d 1185 (challenged article specifically relied on and cited official document released by House subcommittee); *Freeze Right*, 475 N.Y.S.2d at 389 (challenged article specifically relied on and cited official investigatory proceedings); *Sprecher v. Dow Jones and Co., Inc.*, 88 A.D.2d 550, 450 N.Y.S.2d 330, 332 (1st Dep't 1982) (challenged article specifically relied on and cited SEC litigation releases); *Beary v. West Publishing Co.*, 763 F.2d 66, 67 (2d Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 231 (1985) (challenged publication, an advance sheet published by West, specifically relied on and cited judicial opinion as

written by judge); *Gurda v. Orange County Publications Div. of Ottaway Newspapers, Inc.*, 56 N.Y.2d 705, 451 N.Y.S.2d 724, 436 N.E.2d 1326 (1982) (challenged article specifically reported on judicial proceeding). *See also Keogh v. New York Herald Tribune, Inc.*, 51 Misc.2d 888, 274 N.Y.S.2d 302, 305–306 (Sup.Ct.1966) (rejecting Section 74 protection where challenged articles "do not even pretend to be a report of [a judicial] proceeding.... They merely tell a story."), *aff'd*, 28 A.D.2d 1209, 285 N.Y.S.2d 262 (1st Dep't 1967). In this case, the references to the Icelandic court proceedings occur mostly in passing and only towards the end of the Broadcast. (*See* Tr. at 13 ("And now authorities in Iceland have come down hard. Both Donald Feeney and Brian Grayson were arrested and have been convicted on charges of kidnapping, only the second such use of the kidnapping law in Iceland.... We talked with the Graysons last week, just before the Supreme Court of Iceland held up [sic] Brian's conviction and ordered him to prison for two more months."); Tr. at 14 ("Tonight, both Don Feeney and Brian Grayson are in prison in Iceland: Grayson for two months; Feeney, the commando, for two years.")) The ordinary viewer of the Broadcast would not have been under the impression that he was being presented with a report of the Icelandic judicial proceedings—let alone a fair and true report of those proceedings.[6]

foreign proceedings. (*See* Letter of Gayle Sproul, dated March 4, 1994 (citing *Goldreyer v. Van de Wetering*, Index No. 1658/92 001 (N.Y.Sup.Ct., N.Y. County, Nov. 26, 1993)). Further support for this notion can be found in the celebrated *Sharon* case in which Judge Sofaer, in dicta, implied that Section 74 would apply to an official report issued by the Israeli government. *See Sharon v. Time, Inc.*, 599 F.Supp. 538, 542–543 (S.D.N.Y.1984).

Nonetheless, the policy concerns underlying Section 74 are, at the very least, different where foreign judicial proceedings are involved. *See Lee v. Dong–A Ilbo*, 849 F.2d 876, 879 (4th Cir. 1988) (holding that the fair report privilege should *not* be extended to include a foreign government's report because the reasons for the use of the privilege do not apply with sufficient force in the context of foreign government reports and because additional considerations exist that mitigate against applying the privilege to foreign government reports), *cert. denied*, 489 U.S. 1067, 109 S.Ct. 1343, 103 L.Ed.2d 812 (1989); Paul Bech, Isolating the Marketplace of Ideas from

the World: *Lee v. Dong–A Ilbo* and the Fair Report Privilege, 50 U.Pitt.L.Rev. 1153, 1154–55 (1989) ("No court in the United States had examined (in a published opinion) whether th[e fair report] privilege should apply to reports of the official communications of foreign governments until 1988, when a Fourth Circuit Court of Appeals panel decided *Lee v. Dong–A Ilbo*.")

Plaintiffs, while noting that Feeney and Grayson were "convicted of and incarcerated for serious crimes without the benefit of a jury and on the basis of hearsay evidence which would have been inadmissible in any U.S. court," nonetheless do not press the argument that Section 74 is inapplicable to this foreign court proceeding. In light of plaintiffs' stance and the Court's finding that the Broadcast does not, in any event, constitute a report of a judicial proceeding, this issue must await determination in another forum.

**6.** To the extent that DATELINE contends that the Broadcast was as much a "report" of a trial as is possible within the context of its magazine show

Accordingly, the Court concludes that NBC is not protected by the privilege.

■ NBC presents a closer question when it argues that its reference to CTU's bankruptcy should be protected by the Section 74 of the Civil Rights Law. The Broadcast only makes a single reference to CTU's bankruptcy: "The company has been in bankruptcy since 1991—the Feeney's say because they lose money helping American parents." (Tr. at 10.) Plaintiffs argue, first, that if the information on the bankruptcy was the product of DATELINE'S research outside of court records, it is not protected under Section 74. Second, they argue that the statement in the Broadcast is *not* fair and true. As of March 23, 1993, the date of the Broadcast, CTU was no longer in bankruptcy; CTU's reorganization plan was confirmed on August 20, 1991, and the bankruptcy proceeding was terminated on April 24, 1992. NBC argues that plaintiffs are attempting to rely on a technicality; for all intents and purposes, the reference in the Broadcast represents a fair and true report of the bankruptcy proceeding. It is true that NBC's error in reporting ongoing bankruptcy pro-

ceedings does not necessarily make the privilege unavailable. On the other hand, the Broadcast could be perceived to raise questions of possible financial impropriety that may in some minds be confirmed by the inaccurate report of extended bankruptcy proceedings. Accordingly, the Court finds that the bankruptcy allegation survives a motion to dismiss.

### Protected Opinion

NBC's next line of argument is that the Graysons' statements are "protected opinions supported by clearly disclosed and undisputed facts." [7] (Defendant's Mem. at 29–30.) Under New York and Supreme Court case law, there is constitutional immunity for broadcasting "statements of opinion relating to matters of public concern that do not contain a provably false factual connotation." *Immuno AG. v. J. Moor–Jankowski,* 77 N.Y.2d 235, 566 N.Y.S.2d 906, 909, 567 N.E.2d 1270, 1273 (1991) (citing *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18–19, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990) (other citations omitted), *cert. denied,* 500 U.S. 954, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991)). Thus, statements in the Broadcast that can-

---

format, the Court rejects this reasoning. So long as the format of a program makes it impossible for the ordinary viewer to determine whether defendant was reporting on a trial or simply from interviews and independent research, the absolute statutory privilege does not attach. As Section 74 states: "This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof." N.Y.Civ.Rights Law § 74.

Moreover, the Court notes that, in a different context, DATELINE was able to make it perfectly clear that it was quoting from a legal proceeding. At the beginning of the Broadcast, Ross details some of the allegations that Brian Grayson and Fred Pittman levelled against their former wife:

Ross: (Voiceover) When the marriage ended, Brian went to court in Santa Rosa County, Florida, to get custody of his daughter, Anna. And filing papers in conjunction with the father of Elizabeth, the two former husbands claimed Etna was an alcoholic, addicted to prescription drugs, had tried suicide, and was an unfit mother. (Visual; documents shown).

(Tr. at 9.) As indicated, while these statements were being made, the legal documents themselves were displayed on screen. Indeed, using visual graphics, two phrases from the complaints were highlighted and shown in large print: "ad-

dicted to alcohol and drugs" was one such phrase, "severely psychologically unstable," the other. For obvious reasons, these statements are potentially defamatory. Equally clearly, section 74 protects NBC for having made these statements, as they clearly represent excerpts from documents presented in a judicial proceeding.

7. These statements or implications are:

  (a) Falsely implying that CTU and the Feeneys either stole or dishonestly used the Grayson's money. (Compl. at ¶ 67(o).)

  (b) Falsely implying that CTU and the Feeneys had lied about the reason for requiring an extra $10,000. (Compl. at ¶ 67(p).)

  (c) Falsely implying that CTU and the Feeneys had concocted a story about the "60 Minutes" camera crew wanting to accompany them on the mission. (Compl. at ¶ 67(q).)

  (d) Repeating and publishing the Graysons' defamatory and false statements. (Compl. at ¶ 67(r).)

  (e) Falsely stating that the Graysons regretted getting involved with the Feeneys. (Compl. at ¶ 67(s).)

  (f) Falsely implying that CTU and the Feeneys are incompetent. (Compl. at ¶ 67(k).)

  (g) Falsely implying that Don Feeney and Judy Feeney are financially dishonest. (Compl. at ¶ 67(i).)

not "reasonably [be] interpreted as stating actual facts" about plaintiffs are protected. *Milkovich,* 497 U.S. at 18–19, 110 S.Ct. at 2706 (quoting *Hustler Magazine v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41 (1988)). The "key inquiry," therefore, is whether the Graysons' statements "would reasonably appear to state or imply assertions of objective fact." *Immuno AG,* 567 N.E.2d at 1273. In undergoing this inquiry, "the courts are obliged to consider the communication as a whole, as well as its immediate and broader social contexts, to determine whether the reasonable listener or reader [or viewer] is likely to understand the remark as an assertion of provable fact." *Gross v. New York Times Co.,* 82 N.Y.2d 146, 603 N.Y.S.2d 813, 819, 623 N.E.2d 1163, 1169 (1993).

■ Many of the Graysons' comments are indeed non-actionable opinion. For instance, Ginger Graysons' statement that "[the rescue mission] screwed up my husband's life, screwed up my life, screwed up our whole—the whole family's life" is not, as plaintiffs would have it, a "statement of verifiable fact." (Tr. at 13; Plaintiffs' Mem. at 34.) Instead, the reasonable viewer would construe the comment as simple opinion. Any statements by the Graysons implying a belief in plaintiffs' incompetence would be similarly interpreted. *See Rinaldi,* 397 N.Y.S.2d at 950, 366 N.E.2d at 1306 (statement that judge is incompetent is protected opinion where author sets forth basis for that opinion). However, there is a decidedly different tenor to the assertions that imply financial impropriety: "The Graysons say they now regret ever getting involved with the commandos, and they are beginning to wonder if the Feeneys told them the truth; especially about what happened to all the money the Graysons gave them." (Tr. at 13.) While none of these statements appears to provide plaintiffs with a smoking gun to support a defamation claim, they may, by their tone and pregnant implications, be perceived to paint a negative picture of plaintiffs' financial integrity. The Court finds that some of these statements, interpreted in the light most favorable to plaintiffs, could be taken to imply the existence of nondisclosed facts. *See Davis,* 754 F.2d at 86. The New York

Court of Appeals has held that a complaint, "which encompasses actionable assertions of fact as well as nonactionable opinions and conclusions, is sufficient to withstand a motion to dismiss [under the New York CPLR]." *Gross,* 603 N.Y.S.2d at 815, 623 N.E.2d at 1165. By the same token, this complaint survives a motion to dismiss under Rule 12(b)(6).

*Summary Judgment Motion*

■ Styled as a motion for summary judgment, NBC seeks a determination by the Court that the statement concerning the circumstances of Donald Feeney's departure from the Army is substantially true. The Broadcast only makes one reference to Feeney's departure from the Army:

> Ross: Feeney was forced to leave the military in 1986 for less-than-satisfactory service—what Feeney calls some "minor financial improprieties."

Plaintiff Donald Feeney challenges this statement as an "outrageous falsehood[ ]." (Feeney Aff. ¶ 1.) In an affidavit submitted to the Court, Feeney provides a detailed description of his "voluntary withdrawal from the Army." (Feeney Aff. ¶ 3.) For the purposes of this motion, NBC does not take issue with the facts in Feeney's affidavit. (Defendant's Reply Mem. at 7 n. 3.) Rather, NBC argues that "Feeney's own words clearly demonstrate that NBC's statements regarding the circumstances of his discharge were true." (Defendant's Reply Mem. at 2.)

Under New York law, "it is 'fundamental that truth is an absolute, unqualified defense to a civil defamation action,' . . . and 'substantial truth' suffices to defeat a charge of libel." *Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 300 (2d Cir.1986) (Newman, J.), *cert. denied,* 479 U.S. 1091, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987) (citations omitted). Thus, so long as the statement is substantially true, plaintiffs' defamation claim must fail as a matter of law.

The Court has compared Feeney's affidavit with the reference in the Broadcast and finds that the defense of substantial truth has not been satisfied. Most notably, Feeney denies ever stating that he committed "financial im-

proprieties" while in the Army. (Feeney Aff. ¶ 27.) For this reason alone, summary judgment is inappropriate. Although the issue is a close one, having reviewed the allegations, the Court cannot find, as a matter of law, that the statement in the Broadcast about Feeney being forced to leave the military "could have produced no worse an effect on the mind of [the viewer] than the truth pertinent to the allegation." *Guccione,* 800 F.2d at 302 (citing *Fleckenstein v. Friedman,* 266 N.Y. 19, 23, 193 N.E. 537 (1934)). Accordingly, defendant's argument with respect to the circumstances of Donald Feeney's departure from the Army is rejected.

*Claim for Tortious Interference with Pre–Contractual Relations*

Finally, NBC urges dismissal of plaintiffs' fourth claim for relief, arguing that this count "utterly fails to plead the elements of a claim for tortious interference with prospective business advantage." (Defendant's Mem. at 39.) Plaintiffs counter that "under the liberal federal notice-pleading standard," this claim survives a motion to dismiss. (Plaintiffs' Mem. at 40.)

According to the complaint, on August 25, 1992, plaintiffs CTU and Donald and Judy Feeney entered into separate written agreements with Multimedia Television Productions, Inc., an organization that subsequently became Multimedia Motion Pictures, Inc. ("MTP/MMP"). (Compl. ¶¶ 58, 60.) The agreement authorized the use of plaintiffs' names, likenesses, voices, identities, biographies, experiences, and true life stories. (Compl. ¶ 58.) Under the agreements, MTP/MMP purchased "exclusive, irrevocable options" to purchase the television production rights; it was anticipated that a television movie series based on 14 completed missions would be developed and produced. (Compl. ¶ 59.) The option period extended from August 27, 1992 until August 26, 1993. (Compl. ¶ 60.)

Plaintiffs allege that, during the option period, NBC Entertainment entered into an agreement with MTP/MMP to produce a television series based on CTU and the Feeneys. (Compl. ¶ 61.) A writer was assigned to write the scripts and a production budget for the first installment of the movie series was approved. (Compl. ¶ 63.) Just six days before the option period expired, an MTP/MMP employee called Judy Feeney to state that the deal was off. The employee stated in substance that the deal had fallen apart because of the negative portrayals made by DATELINE in the Broadcast. (Compl. ¶ 65.) Plaintiffs allege that defendant intentionally and maliciously used the Broadcast as a basis to destroy plaintiffs' business relationship with MTP/MMP and MTP/MMP's business relationship with NBC Entertainment. But for the Broadcast, NBC would have produced the television movie series and MTP/MMP would have exercised its options. (Compl. ¶¶ 93–95.)

■■■ NBC challenges this claim for a variety of reasons. NBC accurately points out it cannot be held liable for interfering with its own contractual relations. Accordingly, the aspect of the claim charging that NBC destroyed MTP/MMP's business relationship with NBC Entertainment is clearly not cognizable as a tort. As for the other aspect of the claim, that the Broadcast interfered with plaintiffs' business relationship with MTP/MMP, NBC points out that this claim represents little more than a "restatement of the damages plaintiffs hope to recover in their claim for alleged defamation." (Defendant's Mem. at 44.) While this may be true and plaintiffs' decision to burden their pleadings with needless claims may be legitimately questioned, the Court nonetheless finds that the claim withstands a motion to dismiss.

■■ The tort of interference with pre-contractual relations has a somewhat muddled history. *See, e.g., Guard–Life Corp. v. S. Parker Hardware Manufacturing Corp.,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 631, 406 N.E.2d 445, 448 (1980) (stating that the law with respect to the tort of interference with contract relations had not yet "fully congealed") (citation omitted). The parties have gathered cases that appear to contradict one another. Indeed, the parties have not even decided whether the tort should be termed 'tortious interference with pre-contractual relations' or 'tortious interference with prospective business advantage.' Nevertheless,

the essential elements of the tort appear straightforward.

Under New York law, interference with pre-contractual relations is actionable where a contract would have been entered into but for the malicious, fraudulent, or deceitful acts of a third party. *Volmar Distributors v. Maxwell Newspapers,* 825 F.Supp. 1153, 1168 (S.D.N.Y.1993) (citing *CBS v. Ahern,* 108 F.R.D. 14, 26 (S.D.N.Y.1985)). *See also Optivision v. Syracuse Shopping Center Associates,* 472 F.Supp. 665, 684 (N.D.N.Y.1979) (citing New York cases); *Harden, S.P.A. v. Commodore Electronics Ltd.,* 90 A.D.2d 733, 733, 455 N.Y.S.2d 792 (1st Dep't.1982) (interference actionable if the means employed to induce termination of the relationship are dishonest, unfair, or otherwise improper) (citations omitted); *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994) (listing elements of a tortious interference claim). Put another way, "an action will lie against one who prevents the making of a contract by means of fraud or deceit, i.e. by making false representations about one of the negotiating parties, or by means of actual malice not justified by self-interest." 72 N.Y.Jur., Interference § 4 (1983). By these standards, this claim survives a motion to dismiss. To the extent NBC argues that an actual breach is required, (Defendant's Mem. at 39–41; Defendant's Reply Mem. at 13) or that plaintiffs were required to plead "exclusive malicious motive," (Defendant's Mem. at 42), these arguments are rejected. The complaint states a claim. The motion is therefore denied.

### Conclusion

For the foregoing reasons, NBC's motion to dismiss the complaint is denied. NBC's motion for partial summary judgment is also denied.

SO ORDERED.